Isham agt. Trustees of the First Presbyterian Church of Dunkirk.

# SUPREME COURT.

EDWIN ISHAM and others agt. THE TRUSTEES OF THE FIRST
PRESBYTERIAN CHURCH OF DUNKIRK and others.

*Religious societies — Trustees of, no power to divert church property from the
uses and purposes of the denomination of Christians that obtained and
acquired it.*

Under the provisions of the act of 1813, the members of a congregation
of a religious corporation were at liberty to divert the church property
from the dissemination of the views of the persons acquiring it to that
of any other view, whether religious or secular, which might be sanc-
tioned or adopted by a voting majority of the congregation.

But by the acts of 1875 and 1876 (*Laws of 1875, chapter* 79; *Laws of 1876,
chapter* 176), the congregation as well as the trustees of a religious
society are deprived of the power afterwards to divert the church
property from the promotion and dissemination of the religious views
of the persons obtaining and acquiring it, to the promulgation and
maintenance of any different system of religious belief.

Instead of holding the property subject simply to the disposition of the
voting majority of the congregation, the trustees were henceforward
required to hold and devote it to the uses and purposes of the denomi-
nation of Christians in which the society should be included, that
obtained and acquired it.

Under these acts they became in fact as well as in name trustees of the
religious corporation by whose members they should be elected, and
bound to hold the church property according to the discipline, rules
and usages of the denomination, including the corporation itself.

When a clergyman, officiating as such in this society, adopted and
advocated religious views at variance with the Presbyterian articles
of belief, he, by force of these provisions of the statutes, forfeited
his right to use this church edifice for their dissemination. The trus-
tees, by the plain terms of the acts, were deprived of the authority
to allow the church property to be afterwards so used by him, for it
was made their duty to hold it subject to the rules and usages of the
denomination of which this society was a member, and that precluded
its devotion to the inculcation of any system of religious belief adverse
to what was adopted and maintained by the Presbyterian denomination.

The acts of 1875, 1876, in terms, secure the appropriation of such prop-
erty for the denominational purposes for which it has been acquired,
and they who, dissenting from that use of the property, voluntarily
leave the society and enter into another more consonant to their own

religious views, must consequently be regarded as abandoning and relinquishing the rights and privileges they would be entitled to enjoy if such a change had not taken place.

, The persons still adhering to the religious faith and articles of belief of their denomination, and who have heretofore been members of the congregation, are entitled to be continued in the use and enjoyment of this church property.

Courts of equity have jurisdiction over religious corporations so far as may be necessary to enforce the provisions of these statutes.

*Special Term, August,* 1882.

MOTION for an injunction restraining the trustees from closing the church edifice, and thereby preventing its use by the church session and the congregation.

*Hon. Sherman S. Rogers* and *O. W. Johnson,* for plaintiffs.

*W. W. Holdt* and *C. D. Murray,* for defendants.

DANIELS, *J.*— The First Presbyterian church of the village of Dunkirk was incorporated under the laws providing for the incorporation of religious societies, in the year 1873. The corporation was formed by a Presbyterian society previously existing, and its object was to own, preserve and perpetuate the use of the property by the society as a Presbyterian church. Its use continued in that manner until about the year 1880; then differences arose as to one or more of the articles of faith of the congregation, that resulted in a division of the society and the removal of the person at the time employed and officiating as its clergyman. The removal was made by the presbytery in which the society was included, and the deposed clergyman, together with his adherents, have since attended and conducted public worship, in accordance with their views, in another part of the city of Dunkirk. The members of the church and congregation who did not agree with the views of the deposed clergyman have, since this division in the society, been deprived by the board of trustees of the use of the church edifice, and the object of the present

motion is to obtain an injunction restraining the trustees from closing the church edifice against these persons.

As the act of 1813 has been construed, the members of the congregation of a religious corporation were under its provisions left at liberty to divert the church property from the dissemination of the views of the persons acquiring it to that of any other view, whether religious or secular, which might be sanctioned and adopted by a voting majority of the con gregation (*Robertson* agt. *Bullions,* 1 *Kernan,* 243 ; *Petty* agt. *Tooker,* 21 *N. Y.,* 267 ; *Russell* agt. *Reformed Church,* 44 *Barb.,* 283).

This was an extreme construction of the terms in which the. carefully guarded act of 1813 was enacted, and by chapter 79 of the Laws of 1875 the legislature undertook its correction, and for that purpose provided and declared that the trustees of a religious society, incorporated under the act of 1813, should administer its temporalities and hold its property and revenues for the benefit of the corporation, according to the discipline, rules and usages of the denomination to which the corporation belongs (*Laws* 1875, *p.* 79, *sec. 4*).

This enactment was preserved and in terms extended by chapter 176 of the Laws of 1876. The plain purpose of these acts was to abrogate the rule which had grown out of the preceding construction given to the act of 1813, and to deprive the congregation as well as the trustees of the society of the power afterwards to divert the church property from the promotion and dissemination of the religious views of the persons obtaining and acquiring it to the promulgation and maintenance of any different systems of religious belief. Instead of holding the property subject, simply, to the disposition of the voting majority of the congregation, the trustees were henceforward required to hold and devote it to the uses and purposes of the denomination of Christians in which the society should be included that obtained and acquired it. Under these acts they became in fact as well as in name trustees of the religious corporation by whose members they should

be elected, and bound to hold the church property according to the discipline, rules and usages of the denomination, including the corporation itself. These acts were substantially so construed by Mr. justice BARKER for the purpose of sustaining an injunction preventing the deposed clergyman from occupying this church edifice, and they are acquiesced in and adopted as a proper exposition of these enactments.

These statutes do not appear to be liable to the objection that they may be attended with the effect of depriving the corporate owners of the property without due process of law. That was no part of the scheme or purpose of these laws, and their observance cannot be attended with such a result. Their objection and intention was, on the contrary, to prevent the owners from being so deprived of the property which they have acquired, and to devote and confine it to the promotion of the views and purposes leading to its acquisition. It was as manifestly unjust to allow persons becoming members of a religious society, formed for the purpose of inculcating particular views, by their subsequent votes, to appropriate the property they might have done nothing to acquire to the promotion of views of an entirely different character from those entertained by the persons through whose contributions the property may have been obtained. This was a practical abuse which the Laws of 1875-6 were designed in the future to prevent, and they are required to be so construed as to carry that policy into effect.

When the clergyman, officiating as such in this society, adopted and advocated religious views at variance with the Presbyterian articles of belief, he by force of these provisions of the statutes forfeited his right to use this church edifice for their dissemination. The trustees by their plain terms of the acts were deprived of the authority to allow the church property to be afterwards so used by him, for it was made their duty to hold it subject to the rules and usages of the denomination of which this society was a member, and that precluded its devotion to the inculcation of any system

of religious belief adverse to what was adopted and maintained by the Presbyterian denomination. This surely was the situation after the clergyman himself had been deposed by the action of the presbytery to which he, himself, was amenable, as well for his faith as his conduct, as long as no good reason appears for doubting the substantial regularity of the proceedings taken by the presbytery for the purpose. After he was deposed he certainly had no right to occupy this church property as a clergyman, and he as well as those entertaining his views seem to have acquiesced in the propriety of that conclusion, by holding the religious services conducted by him at another place. These acts effectually removed him from this society, and its members who followed him and adhered to him in the promotion of his change of views, must for like reason also be regarded as having voluntarily relinquished their rights as members of this religious incorporation. This result is to be deduced from the substance and effect of the changes made in the management of corporate religious societies by the acts of 1875-6, for they in terms secure the appropriation of such property for the denominational purposes for which it has been acquired, and they who, dissenting from that use of the property, voluntarily leave the society and enter into another more consonant to their own religious views, must consequently be regarded as abandoning and relinquishing the rights and privileges they would be entitled to enjoy if such a change had not taken place.

After that the persons whom the law will regard or recognize as the society, and to the inculcation of whose views the corporate property is to be devoted, are those who are engaged in maintaining and promoting the views of the denomination in whose name and interests the church property was acquired. They remain the legally organized religious society protected by the law, and entitled to enjoy and occupy the property of the corporation. For this purpose, under the rules and usages of the denomination, a majority of such persons entitled to vote may by petition request the session to convene

them for the transaction of any church or secular business at the time requiring their attention. This right has been secured by section 1 of chapter 15 of the Form of Government of the Presbyterian denomination, and the congregation so existing are also entitled to meet together on the Lord's day for the purpose of prayer, singing praises and reading the Holy Scriptures, together with the works of such approved divines as the presbytery within whose bounds they are may recommend, and they may be able to procure. This right is secured to every vacant congregation, by which phrase those undoubtedly were intended to be included as might have at the time no clergyman, and on the occasion of such meetings the elders or deacons of the church are the persons authorized to preside and select the portions of scripture and other books to be read, and to see that the whole be conducted in a becoming and orderly manner. The directions and instructions given for this purpose are very clearly expressed by chapter 21 of the Form of Government of the church. These therefore are purposes to which, under the laws as they now exist, it has become the duty of the trustees to devote the property of the society, and they have no right whatever to close the church edifice to meetings of either of the descriptions of those sanctioned and permitted by these different provisions, constituting a part of the rules or laws of the church. To the extent of using the church property for either of the purposes already mentioned, the society, as it has now been left by the deposed clergyman, and those who support his views, cannot lawfully be excluded from its enjoyment.

By section 6 of chapter 79 of the Laws of 1875, the jurisdiction of courts of equity was so far extended over religious corporations as that might be necessary to enforce the recent provisions of the legislation already mentioned. The application now made is consequently within the limits of this authority, and as the right is found to exist, it seems to follow that the trustees must be so far enjoined by the order of the court as to prevent them from closing the church edifice to

meetings proposed to be convened by the session, upon the petition of a majority of the persons now entitled to vote as members of this society, and still adhering to the articles of faith of the Presbyterian church, and from closing the church edifice against the same persons desirous of gathering there on the Sabbath day, in compliance with and under the authority of chapter 21 of the Form of Government of the church. So far as the person still adhering to the religious faith and articles of belief of their denomination, and who have heretofore been members of this congregation, are entitled to be continued in the use and enjoyment of this church property ( *Watson* agt. *Jones*, 13 *Wall*, 680).

Which of the views involved in this controversy' may abstractly appear to be the most entitled to support, is not a question with which a court of justice has anything to do in an application of this nature. Its power and authority are proprietary in their nature. It is simply required to ascertain what may be the law of the case, and when that is ascertained to enforce it, irrespective of the religious views of either of the contestants. Upon this subject there appears to be no serious ground for doubt, and to the extent already indicated, an injunction will be allowed restraining and controlling the conduct of these trustees in the use of this church property.