KLIX et al., Appellants, v. POLISH ROMAN CATHOLIC ST. STANISLAUS PARISH, a corporation, et al., Respóndents.

**St. Louis Court of Appeals, April 6, 1909.**

1. **RELIGIOUS SOCIETIES: Trust Property: Church Economy.** Real estate conveyed to an archbishop of the Roman Catholic Church, in trust for a certain congregation of that faith, cannot be diverted from the purposes of the trust. It must be applied, according to the terms of the settlement and the church economy of the Roman Catholic Communion, either in the original or some converted form, to the pious uses of the congregation, the *cestui que trust*, whether the title continued in the original trustee or was conveyed to an incorporated society.

2. ———: ———: **Corporations: Statutory Control.** Incorporated religious societies are, in this State and nation, civil bodies politic, unlike ecclesiastical corporations of England. They are amendable to the State courts and governed by the statutes of the State, so far as statutory regulations are prescribed.

3. ———: **Corporations: Purposes of Religious Corporations:** The Constitution forbids the incorporation of religious societies, except to hold title to real estate for prescribed purposes. [Art. II, sec. 8, Const. of 1875.]

4. ———: ———: **Collateral Attack.** But the validity of the incorporation of a religious society cannot be questioned by collateral attack of a private suitor. The appropriate remedy is by *quo warranto,* at the suit of the Attorney-General, or perhaps the prosecuting attorney.

5. ———: ———: **By-Laws: Members of Corporation.** The by-laws of a corporation must be adopted by the members of the corporate body, and cannot be adopted by the directors unless the charter or fundamental law so provides.

6. ——: ——: Directors: Election. The directors of a corporation must be chosen by the members, the corporators, unless the latter have authorized some other mode of choice which the law will tolerate.

7. ——: ——: Membership: By-Laws: Charter. A religious corporation must adopt by-laws for its government and support, and the management of its property, and must provide how members shall be admitted, unless the charter so provides.

8. ——: Corporations: Church Government. When a church has been incorporated, the regulations and customs of the communion to which it belongs regarding the disposition of secular business, will be respected by the courts as far as possible; the mode of government in force in the denomination at large will be upheld by the courts if it can be consistently with the laws of the sovereignty.

9. ——: ——: Control of Church Property. And this applies to the control of church property. If a schism occurs in some congregation over a tenet of faith, and each faction claims the church property, it will be awarded to the one which adheres to the original doctrines of the church, and the decision of the church judicatories as to what those doctrines are will be accepted by the civil courts, when such judicatories exist and have authority to decide. The civil courts are concerned with points of faith only when they must be ascertained in order to know where the property belongs.

10. ——: ——: Church Government: Control of Courts. The courts should adopt, if possible, in determining the control of church property and the method of church government, such a view of the law as will permit religious bodies to be incorporated and yet preserve their original form of church government.

11. ——: ——: ——: Members of the Corporation. Interpreting the constitutional and legislative provisions relating to religious corporations, and their historical development, and giving effect to the established polity of the Roman Catholic Church, and its hierarchal government, where property was conveyed to an archbishop of the church in trust for a local congregation, and afterwards by him conveyed to a corporation organized by and composed of only a few members of that congregation, and was thereafter controlled by such corporation for the benefit of the congregation, and contained the church and parochial school of the congregation, buildings erected by contributions from the members; members of the congregation, other than the incorporators, were not members of the incorporated body, nor were they entitled to a decree conferring membership on them.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel G. Taylor,* Judge.

AFFIRMED.

*Mackay & Mackay* for appellants.

The plaintiffs were members of the old congregation of St. Stanislaus and under the articles of association and deeds read in evidence became members of the new corporation known as the Polish Roman Catholic St. Stanislaus Parish. R. S. 1889, sec. 2822; North St. Louis Church v. McGowan, 62 Mo. 279; 2 N. Y. Stat. 1813, p. 212; Robertson v. Bullions, 11 N. Y. 243, 9 Barb. 64; Bank v. St. Anthony's Church, 109 N. Y. 520; Coal Co. v. Bingham, 97 Mo. 196; West Koshkonong Congregation v. Ottesen, 80 Wis. 62; Holm v. Holm, 81 Wis. 374; Spiritual & Philosophical Temple v. Vincent (Wis.), 105 N. W. 1026; Trustee v. Bly, 73 N. Y. 323; 24 A. and E. Ency. Law (2 Ed.), 361; Baptist Church v. Witherell, 3 Paige 296; Dubs v. Egli, 167 Ill. 514; Christian Church v. Church of Christ, 219 Ill. 503. Plaintiffs have the right to sue on behalf of themselves and those represented by them in an equitable proceeding and relief may be granted to all; it is unnecessary to enter the special appearance of all. Lilly v. Tobein, 103 Mo. 477, 488; 15 Ency. Pl. and Pr., 727; Gibson, Suits in Chancery (2nd Ed.), sec. 92; Story, Eq. Pl. (10th Ed.), sec. 99. The incorporation of the defendant corporation is not in conflict with the Constitution of Missouri. The question of its legality was not raised by the pleadings, nor can it be determined in this collateral proceeding. Mo. Const., art. 3, sec. 8; Catholic Church v. Tobbein, 82 Mo. 419; St. Georges Church v. Branch, 129 Mo. 226, 243; State v. Westminster College, 175 Mo. 52; *In re* St. Louis Institute, 27 Mo. App. 633. The by-laws of the defendant corporation are illegal and void because adopted by the directors and not by the corporation, and because they

are unreasonable, oppressive and harsh.    10 Cyc. 353-357; R. S. 1899, secs. 971 (sixth), 969, 1403.; Carroll v. Bank, 8 Mo. App. 249, 253; Savings Assn. v. Printing Co., 25 Mo. App. 642, 647; Walser v. Ptg. Co., 56 Mo. App. 145, 155; Trust & Savings Co. v. Home Lumber Co., 118 Mo. 447, 456; Thomas v. Musical Mutual Protective Union, 121 N. Y. 45.

*Daniel Dillon* for respondent.

Plaintiffs are not members of the corporation defendant, and as their petition and claim for relief is bottomed on their allegation that they are such members, their petition was properly dismissed.    R. S. 1899, secs. 1394, 1395, R. S. 1889, secs. 2821, 2822.    This point will be discussed at length in the argument.    Under the facts established at the trial plaintiffs have no ground whatever for asking the aid or interference of a court of equity.    The facts developed at the trial show that the corporation defendant has faithfully and honestly lived up to the purposes for which it was incorporated and has honestly and successfully and with remarkable ability improved and managed the corporate property and finances, and has provided the Polish Catholics in St. Stanislaus parish with a magnificent church, open at all suitable hours, and in which all the services, devotions and exercises usual and customary in Catholic churches, are conducted and carried on.    The corporation also provided a school for the parish.    24 Am. and Eng. Ency. (2nd Ed.), p. 351.    Determann v. Lueherman, 74 Iowa 275; Fallbright v. Higginbotham, 133 Mo. 678.    This point will also be discussed in the argument.    The legality or regularity of the election of directors of the defendant corporation cannot be passed upon in this form of proceeding.    They can be removed by *quo warranto* only. R. S. 1899, sec. 1407; Railroad v. McPherson, 35 Mo. 13; St. Louis Co. Court v. Sparks, 10 Mo. 117; St. Louis v. Shields, 62 Mo. 252; Catholic Church v.

Tobbein, 82 Mo. 424; State *ex rel.* v. Meek, 129 Mo. 431; Hughes v. Parker, 20 N. H. 58.

GOODE, J.—On February 29, 1888, an incorporated religious society styled the Franciscan Fathers of the State of Missouri, by a deed duly executed, conveyed to Peter Richard Kendrick, Archbishop of the city of St. Louis, certain described tracts of land in said city "in trust for the congregation of St. Stanislaus of the city of St. Louis and assigns forever;" the said Franciscan Fathers covenanting that they and their successors would warrant and defend the title to the premises unto the said party of the second part (Archbishop Kendrick) and unto his successors in trust and assigns forever. This deed recited a consideration of $12,000, but according to the evidence no consideration was paid. The *cestui que trust,* the Congregation of St. Stanislaus, is composed of Polish communicants of the Roman Catholic Church, residing in St. Stanislaus Parish in the city of St. Louis and who are members of a certain church in said parish. The pastor or priest of the parish in 1885 was Rev. Urban Stanowski, and he has been the incumbent ever since. At the origin of the controversy which gave rise to this litigation, the congregation was a large and wealthy one we understand, consisting of nearly two thousand members, owning property, including a church and a parochial school building valued at about $300,000, and receiving and dispensing annual revenues amounting to $7,000 and upwards. The buildings were erected with contributions from the members and the yearly income is collected in the same way. The congregation maintained a parochial school and perhaps other auxiliary enterprises. In 1891 a new church house was to be erected at a cost which made it necessary to borrow money, and it was deemed best to form a corporation to take and secure the loan. Rev. Urban Stanowski, the pastor, announced the purpose to do this to the congregation and no one objected, though it is not in proof

that a vote was taken on the question.    Said Stanowski
and five other members of the congregation, selected by
him, to-wit, Joseph Olszewski, John Grabowski, Josef
Grabowski, Michal Werozynski and Wlodyslow Pilinski,
signed a document styled Articles of Agreement of the
Polish Roman Catholic St. Stanislaus Parish, and de-
clared in the preamble they had associated themselves
for the purpose of forming a religious association and
had agreed on what followed in said Articles as a con-
stitution.    The first article of the constitution merely
said the name of the association should be the Polish
Roman Catholic St. Stanislaus Parish.    The second, de-
clared the purpose of the association should be to unite
in a church congregation Polish Roman Catholics, main-
tain a Polish Roman Catholic Church, encourage attend-
ance at Roman Catholic religious services, attendance
at lectures of a religious, scientific or educational char-
acter and maintain a parochial school.    The third ar-
ticle declared the business meetings of the association
should be held at the residence of the priest of the parish
at such times as might be determined by the by-laws to
be adopted by the association.    These three articles,
which constituted the Articles of Agreement and also
the Constitution of the proposed society, were submitted
to the circuit court with a petition praying for a *pro
forma* decree of incorporation, and in due time a decree
was entered.    The Articles of Agreement, with the
proper certificate from the clerk of the circuit court
and the recorder of deeds, were filed in the office of the
Secretary of State and the latter issued a certified copy
of the same as the charter of the corporation.    This
business was concluded May 2, 1891, and on May 8th,
Archbishop Kendrick, as trustee for the congregation of
St. Stanislaus, executed a deed to the "Polish Roman
Catholic St. Stanislaus Parish, a corporation organized
under the laws of the State of Missouri, of the same
place," conveying to said corporation all the properties
which had theretofore been conveyed to him by the Fran-

ciscan Fathers in trust for the said congregation. The deed to the corporation recited the former conveyance by the Franciscan Fathers in trust to Archbishop Kendrick and that the corporation was "successor to the rights of the *cestui que trust,* the congregation of St. Stanislaus." The six men who had petitioned for incorporation, adopted certain regulations, part of which are styled "Charter" and part "By-laws," but all of them are at the most merely by-laws; for the statutes of the State and the Articles of Agreement constitute the charter of the society. It is enough to state concerning the adopted regulations that they provided for the government of the corporation by six directors to be appointed by the Archbishop of St. Louis; for the filling of vacancies in the board by him; the adoption of by-laws and the election of new members of the corporate body by the directors, and that all the powers of said board should be exercised in conformity to the discipline and usages of the Roman Catholic Church and such regulations as might be established from time to time for the good of said church. Broad powers were vested in the priest of the parish as President of the Board, and primarily he and the directors control the corporation, but ultimately the archbishop of the diocese by virtue of his authority to appoint the directors. The members and officers of the body politic must be members of the St. Stanislaus congregation. These defendants, except one of them, have continued as directors of the corporation, managed its affairs and dealt with its property as they deemed best, without interference from the members of the congregation. In truth the evidence shows Rev. Urban Stanowski, the pastor, has dominated directly the entire management of the temporal and spiritual affairs of the church, and through him the Archbishop of the Diocese of St. Louis. Once a year the pastor would read a statement of the receipts and disbursements to the congregation, but he did not hold

137 App.—23

himself responsible to them nor bind himself to make a report. In 1904, many members of the parish became dissatisfied with the parish school, believing the teachers, who were members of a certain sisterhood, were inefficient. These teachers were removed and others substituted in their places. Nevertheless dissatisfaction continued, and it was aggravated by the refusal in that and the succeeding year to allow the St. Stanislaus society to commemorate, as it theretofore had done, one of the Polish national anniversaries in the hall of the parish. Plaintiffs, and those who sided with them, held they were entitled to vote for directors, have a voice in the management of the affairs of the church, the disposition of its funds, and, in short, have the board of directors elected by and represent the wishes of the majority of the congregation. These matters the pastor refused to concede and the outcome of the controversy was the institution of the present suit in equity, wherein the plaintiffs allege, *inter alia,* they have been unlawfully excluded from the meetings of and their rights in the corporation, and from holding an election of officers and trustees; further allege all the defendants, except Father Stanowski, are ignorant, incompetent and unfit to act as trustees, have turned over to the pastor the entire management of the affairs of the church and have been unduly influenced by him in all matters; that the parish school was formerly flourishing, but is now in a ruinous condition, and they have been deprived of the use of the church and buildings for corporate purposes; that they are remediless at law and relievable only in a court of equity and pray that each and every paragraph of the charter and by-laws be declared null and void; the board of directors be enjoined from further enforcing the by-laws and conducting the business of the corporation according to them; from further acting as directors and trustees; that the court order a meeting of the members of the congregation to be held to adopt suitable by-laws and elect proper officers; and

for other and proper relief.   Plaintiffs say they prosecute this suit in behalf of many members of the congregation who have contributed to the expense of prosecuting it and all other members who have like interests and have elected to share in the benefits of the suit; it being alleged the dissident members are too numerous to be joined as plaintiffs and, indeed, that some twelve or thirteen hundred, out of a total membership of more than sixteen hundred are in sympathy with the plaintiffs and their cause.   No misuse of the funds of the church, either fraudulent or careless, was proved and the grievances complained of finally come down to this contention: plaintiffs are entitled to be recognized as members of the corporation, have a voice in making its by-laws, choosing its directors and generally in governing the church.   At the conclusion of the evidence the court below held plaintiffs were not members of the corporation; that the charter of the society transcended the provisions of the Constitution of the State and hence plaintiffs were not entitled to be declared members, because the court would not decree a man should enter a corporation created in violation of the Constitution. Thereupon the bill was dismissed and plaintiffs appealed.

As will be perceived from the stated facts, this controversy did not grow out of a schism over questions of faith, but out of dissensions regarding the temporal affairs of the parish, including the use of the buildings and the conduct of the parochial school.   These disagreements finally developed in plaintiffs a consciousness of the sole grievance they ask to have redressed—namely, that they are excluded from participation in the government of the incorporated society.   The evidence introduced by the parties was not directed toward proving the church economy of the Roman Catholic communion, but nevertheless this was revealed in large measure and, in our judgment, must have much to do with the disposition of the appeal.   The evidence indicates that the

Franciscan Fathers settled the lots conveyed to Archbishop Kendrick, in trust for the congregation of St. Stanislaus, and if this is true they cannot be diverted from the purposes of the trust. We do not mean they can never be sold or otherwise disposed of in any exigency and their proceeds devoted to the trust, but simply that, like all other properties settled to specific charitable uses and for a designated class of beneficiaries, they are to be applied according to the terms of the settlement, and either in their original or some converted form, consecrated to the pious uses of the congregation of St. Stanislaus, no matter whether the title continued in the original trustee Archbishop Kendrick and his successors in the St. Louis Diocese, or, as happened, was conveyed to an incorporated society. [Atty.-Gen. v. Pearson, 3 Merivale, 352; Gram v. Society, 36 N. Y. 162; Schnorr's Appeal, 67 Penn. St. 138; Venable v. Coffin, 2 West. Va. 310; Gibson v. Armstrong, 7 B. Mon. (Ky.) 481; Kynett, Laws Relig. Corp., 33.] Unless the contention of these plaintiffs that they and the other members of the congregation should have a voice in the control of the property, is to prevail, the courts could not interfere with the trust except to prevent a diversion of the property to other uses, or mismanagement and waste. These things would be done upon the solicitation of the proper parties and in a proper proceeding; but who might sue or in what forum is not for inquiry on the present appeal, because no abuses of management were proved. Yet the extent of the relief plaintiffs could have obtained if the title to the property had remained in the Archbishop of St. Louis, ought to be remembered. They might have invoked the appropriate civil court to check maladministration but could not have been awarded participation in the administration—could not have been made, in effect, co-trustees; at least, unless the laws and usages of the Roman Catholic denomination entitled them to participate; and the evidence tends to prove they do

not. Hence if the successive Archbishops had handled the property discreetly and for the purposes for which it was donated or acquired, the members of St. Stanislaus Parish would have suffered no wrong of either legal or equitable cognizance. Therefore the question confronting us is whether the rights of said members were enlarged by incorporating—whether passing the title to a body politic, which Archbishop Kendrick, in order to acquire corporate advantages, caused to be organized under our statutes for the incorporation of religious societies, conferred on the members of the congregation membership in the corporation, with the concomitant privileges to adopt by-laws, elect directors and share in controlling the temporalities of the parish. The correct decision of this question depends entirely on a sound interpretation of the pertinent statutes. This is true because incorporated religious societies are, in this State and nation, civil bodies politic and unlike the ecclesiastical corporations of England, which are composed only of clericals, such as archbishops, deans, monks and abbots, and amenable only to spiritual courts. Incorporated societies like the Polish Roman Catholic St. Stanislaus Parish being civil institutions, are amenable to the ordinary courts of the State and governed by the statutes under which they are organized, so far as statutory regulations are prescribed. [1 Blackst. 470; Robertson v. Bullion, 9 Barb. (N. Y.) 84, 87; Id. 11 N. Y. 243; Fadness v. Braunborg, 73 Wis. 257; West Koshkonong v. Ottesen, 80 Wis. 62; Holm v. Holm, 81 Wis. 374; Spiritual, etc., Temple v. Vincent, 127 Wis. 93; Wilson v. Livingston, 99 Mich. 594; Calkins v. Cheney, 92 Ill. 463.]

To clear the way for the decision of the point of law more directly at issue, we will state first some propositions of indirect relevancy. The establishment of religious corporations except to hold title to such real estate as may be prescribed for church edifices, parsonages and cemeteries, is forbidden by the Constitution

of the State. [Const. 1875, Art. II, sec. 8; Lilly v. Tobb-ein, 103 Mo. 477, 488.] But the validity of the incorporation of a religious society cannot be drawn into question by a private suitor in a collateral proceeding. The appropriate remedy is by writ of *quo warranto* at the suit of the Attorney-General, or perhaps a prosecuting attorney. [Catholic Church v. Tobbein, 82 Mo. 498; St. George Church Soc. v. Branch, 120 Mo. 226, 243; Reorganized Church, etc., v. Church, 60 Fed. 937; Dubs v. Egli, 167 Ill. 514.] The by-laws of a corporation must be adopted by the members of the corporate body, and cannot be by the directors unless the charter or fundamental law so provides. [Carroll v. Sav. Bank, 8 Mo. App. 249; Sav. Inst. v. Printing Co., 25 Mo. App. 642; Albers v. Merch. Exch., 39 Mo. App. 533; Watson v. Printing Co., 56 Mo. App. 145; Trust, etc., Co. v. Lumber Co., 118 Mo. 477.] And the directors of a corporation must be chosen by the members, that is, by the corporators, unless the latter have authorized some other mode of choice which the law will tolerate. [Angell & Ames, Corporations (11 Ed.), ch. 9, sec. 277.] Our statutes say every religious corporation shall make by-laws for its government and support, and the management of its property; and shall provide how new members are to be admitted and prescribe their qualifications, unless the charter does so. [R. S. 1899, sec. 1403.] The by-laws of the incorporated body denominated Polish Roman Catholic St. Stanislaus Parish, were adopted by the six persons who signed the articles of agreement, and these by-laws authorized the appointment of directors by the Archbishop of St. Louis. As the statutes left the adoption of by-laws to the members, if the six men who subscribed the articles of agreement, composed the entire membership of the corporate body, they had power to enact by-laws and to say how directors should be elected, inasmuch as no statutory method is prescribed. On the contrary, if all the communicants of the congregation of St. Stanislaus became members

of the corporation, by force of the statutes and simultaneously with the act of incorporating, those members had the right to frame by-laws and fix the method of choosing directors. In the latter contingency no office of director has been created; for such an office is provided for only in the by-laws and these were a nullity if enacted by but a remnant of the membership. We incline to the opinion that members of an incorporated religious society who are deprived of their privileges by usurpers, may invoke the writ of injunction to redress the wrong, and cases in support of this practice will be cited; but as our decision of the present cause is to rest on another ground than the form of procedure, it is unnecessary for us to treat of the latter. [1 Thompson, Priv. Corp., secs. 909, 911.]

From what has been said it will be apparent that the decision must turn on whether all the members of the congregation were members of the corporation, or none were members of the latter body except the six subscribers of the articles of agreement and such others as were associated with them afterwards in the manner prescribed in the by-laws. Several appellate courts in this country, following the New York Court of Appeals in the cases cited supra, have held that when a corporation is formed for religious purposes, every one who belongs to the congregation becomes, by force of the statutes, a member of the corporation, even though a few individuals are named in the charter as trustees or directors, and that document is issued to them. The pioneer opinion on the subject, which was the one delivered in Robertson v. Bullion, held the majority of a congregation could control the secular affairs of the church, and even retain possession and enjoyment of the temporalities after abjuring the creed of the sect, against a minority which adhered to the creed. Otherwise stated the effect of said decision and others like it, is this: a church or congregation by incorporating is constituted a civil political institution composed of

the members of the congregation; and the sovereignty of the body, so to speak, vests in and remains with the majority, regardless of whether they adhere to the orthodox faith of the sect and continue in fellowship with its synods, presbyteries or other governing bodies, or become heretical and recusant. It is believed all the statutes on which the courts pronounced in those cases, made the members of the congregation corporators either by express words or reasonable implication, thereby excluding, as was thought, any different construction. Manifestly, under such a doctrine, the bare act of organizing a legal body to take title to real property and attend to such business affairs as the law entrusts to corporations, might operate disastrously on the enjoyment of the property by the orthodox members of a congregation, if a schism arose and the dissenters were the more numerous; and might radically alter the mode of conducting secular affairs if no doctrinal disagreement occurred and every one preferred the denominational mode. In view of the general spirit of religious tolerance prevailing in this nation, likely the Legislatures of the States where the statutes in question were enacted, never intended such consequences, which came to pass from a careless use of language, or, perchance, an extreme construction of the acts, as was said in Isham v. Trustees, 63 How. Prac. 465. At all events the original statute of the State of New York worked so badly as to induce changes whereby various religious denominations, with diverse forms of church government, were enabled to incorporate their separate churches without necessarily making the members of the congregations corporators or conferring control on the majority of the congregation; and thus it became possible to incorporate a church and not revolutionize its mode of government. [3 Gen. Laws and Stat. New York (Cumming & Gilbert Ed.), ch. 42.] Selecting a pertinent instance, we point to Article III of the cited chapter, which authorizes a Roman Catholic church to incorporate by a

certificate executed and acknowledged by the Archbishop
and Vicar-General of the diocese, the rector of the parish
and two laymen chosen by those officials, and says these
trustees shall constitute a self-perpetuating body.   Dis-
tinct statutes were enacted for incorporating churches of
the Presbyterian, Episcopal, Dutch Reformed and per-
haps other communions; the purpose being to provide for
the creation of organic bodies in the different sects, and
at the same time permit the internal economy of the
churches to continue according to the usual methods,
instead of arbitrarily superseding it.   By this means
all legal and business benefits to be derived from organ-
izing under the statutes are afforded a congregation,
without forcing it to submit to a form of control alien
to the essential character of the communion and out
of harmony with its general usages.  The later statutes
of New York were enacted around the year 1875, and it
is of some significance that, beginning at the same time,
changes suggestive of a similar purpose were made in
our laws on the subject of religious societies, as will be
shown infra.   In Isham v. Trustees, contrary to the
doctrine of the earlier cases, the court declared the ma-
jority of a congregation could not divert the temporali-
ties from the objects to which they were originally de-
voted, and that the trustees were bound to hold them
for the benefit of and according to the rules, discipline
and usages of the denomination; and, in truth, the
statutes so provided.   The change of legislative policy
was commented on in First Reformed Church v. Bow-
den, 10 Abb. New Cas. 3, where it was said that prior
to the new statutes, the courts paid no attention to
the faith or usages of a denomination and would not
enforce any ecclesiastical law or rule of church govern-
ment; that in at least one particular such bodies did
not have the ordinary rights of a business company;
for the courts would interfere to prevent a diversion of
business assets, but not ecclesiastical assets.  Still fur-
ther construing the later laws, the New York Court of

Appeals in People's Bank v. Catholic Church, 109 N. Y. 512, said that under them the members of a congregation became, in a sense, members of the corporation; but nevertheless in an incorporated Roman Catholic Church, the trustees were invested with exclusive power to manage and control the corporation and were self-perpetuating and independent of the congregation. Sometimes it will be very useful for churches to incorporate in order to transact their secular affairs conveniently, and the wiser policy would permit them to do so without depriving the established ecclesiastical authorities of power.    Many religious sects, and among them the Roman Catholic, are of world-wide extent and vast membership, with congregations, parishes and established hierarchies and councils in every land.  . For ages they have observed a uniform polity, not only in spiritual matters, but in the transaction of secular business and the management of their properties.    To force upon them an unaccustomed economy would introduce confusion and embarrassment; whereas to refuse them corporate capacity, except on the condition of renouncing their customs, would be illiberal treatment by the State. The record indicates that in the Roman Catholic communion, the titles to church possessions are vested in the bishops and archbishops, who manage them either directly or through the parish priests and without participation by the congregation.  A statutory alteration of the form of church government may not constitute interference with matters of faith, yet nevertheless, the right of every religious sect to preserve the peculiar economy it prefers, and perhaps has obeyed immemorially, touches closely, if it is not part of, that religious freedom which American constitutions guarantee. [Const. Mo. 1875, art. 2, secs. 5, 6 and 7.]    This truth was admirably set forth in the opinion of the Court of Appeals of South Carolina in the cognate case of Harmon v. Dreher, 1 Speer Eq. 87, 123, wherein, in answer to the argument that the congregation should govern,

the court said if it was the case of a Congregational
Church, this might be true, because, if the congregation
had been so incorporated, it would be according to the
very terms of the association that the majority should
govern.   "But if the incorporation of the church as a
Lutheran Church, imports what has been stated in evi-
dence, it would be a breach of all liberty, as well as of
faith, that the majority should impose a new contract
upon the minority.   Suppose a majority should next
year spring up in favor of the Roman Catholic or Moham-
medan Religion, and introduce auricular confession and
indulgences, or the Koran, into this congregation, would
not these defendants, however small a minority they
might form, see and feel that their liberties were tram-
pled on, by so gross a violation of the contract of asso-
ciation contained in their charter?   The truth is, that
liberty is violated wherever contracts are infringed; as
much where the infringement consists in the provision
of a charter, as where a majority of mercantile copart-
ners choose to make their will, and not their articles, the
rule of their conduct; as much where the charter is to
a religious body, as where it is to a civil corporation."
It would be tyrannical to coerce the different religious
communions into the adoption of one rigid type of
church government—to make, as it were, a Procrustean
bed in which all must lie—unless such a course is re-
quired in order to safeguard some paramount policy of
the State; and we do not see that the weal of the public
in this commonwealth would be threatened by tolerat-
ing different kinds of church government, any more
than it is by tolerating different creeds and devotional
rites.   Moreover, the property conveyed by the Fran-
ciscan Fathers was granted by an Order of the Roman
Catholic church to a high prelate of said church in
trust for one of its congregations, and, as we may rea-
sonably presume, in the expectation it would be held
and administered according to Roman Catholic usages.
The evidence proves there is a graded hierarchy in the

Catholic Church, extending from the priests of parishes, through bishops and archbishops to the Roman See; and as said, the higher clericals, and not the congregation, hold title to and manage temporalities.

The courts of the country have been called on often to adjudicate property rights in consequence of divisions in churches and sects, and have expounded the principles of law which ought to govern these right with learning, wisdom and serious concern to promote perfect freedom, not only of conscience and creed, but of denominational usages. We cannot review the judgments of eminent tribunals in cases cited *infra* where these questions were considered, but will state what we think is the principle pertinent to the point in present controversy, and deducible from them, looking with more care into the two or three decisions which are most germane. The principle is this: when a church has been incorporated, the regulations and customs of the communion to which it belongs regarding the disposition of secular business, will be respected by the courts as far as possible; and if the mode of government in force in the denomination at large is not by congregations, but by superior clerical personages, assemblies, synods, councils or consistories, the authority of these will not be displaced if it can be upheld consistently with the laws of the sovereignty. In Prickett v. Wells, 117 Mo. 502, 505, our Supreme Court said:

"The people of that society (Christian Church) in the exercise of their religious liberty, had the undoubted right to adopt rules for their own church government, if not inconsistent with the Constitution and laws of the land. In adjusting their respective claims to the use of the church property, as between themselves, the civil courts will give effect to those rules, subject to the qualification just adverted to."

That language was copied with approval in Russie v. Brazzell, 128 Mo. 93, 112, and both cases were controversies over church property. In passing on a similar

controversy in an incorporated Presbyterian church, a
sect governed by graded assemblies and not by congre-
gations, the Supreme Court of the United States decided
the property was held by the trustees according to the
constitution, usages and laws of the Presbyterian com-
munion.    [Watson v. Jones, 80 U. S. 679, 720.]    It
will be seen in the report of the decision of the Court
of Appeals of Kentucky in the same case (2 Bush. [Ky.]
332) that land had been conveyed to three persons and
their successors, to be chosen by the congregation, in
trust for the Third Presbyterian Church of Louisville.
The congregation split into two factions over the ques-
tion of slavery, and the General Assembly of the denom-
ination ordered an election by the congregation of four
additional trustees; plainly to give control of the prop-
erty to the faction favored by the General Assembly.
Said faction elected the new trustees and the question
was whether they were entitled to act.    The judgment
of the Supreme Court of the United States in their
favor was contrary to the judgment of the State Court
of Appeals; and its ultimate effect was to award con-
trol of the property of the church to the General As-
sembly instead of leaving it with the congregation, on
the ground that the former body was supreme by the
laws of the denomination.    The same principle was ap-
plied in passing on nearly the identical point, by our
Supreme Court in State ex rel. v. Parrish, 45 Mo. 183.
That controversy was over the right of certain persons
to act as trustees of Lindenwood College.    Those per-
sons had been elected trustees by the St. Louis Presby-
tery, and this was according to the charter of the col-
lege granted by the Legislature.    But prior to their
election the St. Louis Presbytery had been cut off from
the denomination by a resolution of its General Assem-
bly.    The Supreme Court held this fact invalidated
the election because, under the usages and laws of the
denomination, the Assembly possessed "the unlimited
control of superintending the concerns of the whole

church and of suppressing schismatical contentions and disputations." The general rule is in accordance with those decisions and is followed most frequently under these circumstances: a schism occurs in some congregation over a tenet of faith and two factions claim the church property; whereupon it will be awarded to the one which adheres to the original doctrines of the church and the decisions of the church judicatories as to what these doctrines are will be accepted by the civil courts when such judicatories exist and have authority to decide. The civil courts are concerned with points of faith only when they must be ascertained in order to know where the property belongs. In Harmon v. Dreher, supra, the controversy was over the power of a dissident Lutheran congregation, which had been incorporated, to employ a certain pastor and control the property of the church as against the decree of the synod, and the claim of the congregation was rejected. In Gibson v. Armstrong, 7 B. Mon. (Ky.) 481, 491, there was a factional struggle over a church house of the Methodist Episcopal denomination, the government of which is by a General Conference, and the court said:

"It is, in fact, the local society worshipping at the place, that is entitled to the use, and individuals are entitled only as members of, and in subordination to the society, to which in its organized form and in subjection to the rules and discipline and general legislation of the Church of which itself is a part, belong the immediate use and control of the local premises. Any dispute between individuals and the society in regard to the fact of membership, or the rights pertaining to that relation, must present an ecclesiastical question, of which the decision by the tribunals of the Church would, in general, be regarded as final by the civil power."

Other cases which accept the proposition we have quoted are Shannon v. Frost, 3 B. Mon. (Ky.) 253; Den v. Bolton, 12 N. J. Law 206; Den v. Pilling, 24 N. J. Law 653, 657; German Refd. Church v. Seibert, 3 Barr

(Pa.) 291; Pullis v. Iserman, 58 Atl. (N. J.) 554; Duessel v. Proch, 78 Conn. 343; Ferraria v. Vasconcellos, 31 Ill. 25; Schradi v. Dornfeld, 52 Minn. 465; Andrews v. Andrews, 110 Ill. 223; Christian Church v. Church of Christ, 219 Ill. 503. Our present interest in those opinions has no relation to schismatic dissensions, but is with the underlying principle of the judgments, that deference will be accorded when possible, to the established tribunals and settled usages of a denomination, not only in matters of doctrine, but of church government; and certainly the principle ought to apply in a case like this where there has been no attempt to deprive any member of the congregation of the enjoyment of its property, and the question goes only to who shall administer the trust. Hence Watson v. Garvin, 54 Mo. 353, whatever was the exact point therein decided, is not apposite.

The foregoing examination of the adjudged cases and reflections upon them, have been indulged rather because they suggest the spirit in which we should approach the interpretation of our statutes for the incorporation of religious bodies, which is the main task before us, than because they make manifest what the true interpretation is. We should adopt, if we can, such a view of the law as will permit religious bodies to be incorporated and yet preserve their original form of church government, instead of revolutionizing it from a hierarchal or synodical into a congregational form; and we ask whether our statutes can be so construed without doing violence to their language and intention. At this point the course of constitutional and legislative enactments on the subject becomes important, as pointing to an alteration in the policy of the State. The Constitution of 1865 declared no religious corporation could be established in this State, except that by a general and uniform law any religious society might become a body corporate for the sole purpose of acquiring, holding, using and disposing of such land as might be re-

quired for a house of public worship, chapel, etc., "and contracting in relation to such land and the buildings thereon *through a board of trustees selected by themselves."* [Art. 1, sec. 12.] The Constitution of 1875 declared "no religious corporation can be established in this State except such as may be created under the general law for the purpose of holding title to real estate for church edifices," etc. [Art. 2, sec. 8.] This Constitution, unlike that of 1865, says nothing about the management of the properties of an incorporated religious society by a board of trustees "selected by themselves." Hence, whereas the former required the board of trustees to be selected by members of the society or congregation, the second required nothing of the kind, but left the matter open to legislative regulation and if no statutory rule was imposed, then presumably to the laws and usages of the denomination. Turning to the legislation under the Constitution of 1865, we find the first statute enacted did not, in express terms, empower religious societies to organize under it, but allowed any association of persons desirous of becoming incorporated for benevolent or charitable purposes, to present to the circuit court, or judge in vacation, a copy of the articles of agreement of the association, *and a list of all their members,* together with a petition for a certificate of incorporation. [1 Wag. Stat., Art. 8, sec. 2.] Whether a church might have organized under that article was never determined; for the first case which occurred regarding a church corporation and who composed it, fell under the amending act of 1871, which provided specifically for the formation of religious bodies politic and empowered any number of persons not less than three, to become an incorporated church, religious society or congregation, by complying with the provisions of said article 8, save that it declared if the petition was signed by all the persons making the application, this would be sufficient, and that "when so incorporated such persons and their associates and successors"

should be known by the name specified in the certificate, and be entitled to all the privileges and powers conferred by the Constitution of the State on such bodies. [1 Wag. Stat., p. 340; Session Acts 1871, 1872.] The amendment related only to religious societies and involved two noticeable variations from the prior provisions of the article regarding the organization of such associations as were previously either enumerated or implied by its language. The variations were that no list of members of the congregation was required in connection with the petition for incorporation, and the persons who applied for the charter and their associates and successors, were to constitute the body politic. It is unlikely the article was passed because it was deemed impossible for religious societies to incorporate under the article as it stood; for said article, as well as the amendatory act of March 5, 1868, and chapter seventy of the General Statutes of 1865, all purported in their captions to relate to the incorporation of "Benevolent, Religious and Educational Associations;" thus fairly implying that a religious association might organize under the provisions. More probably the purpose was to evade the necessity of appending a list of members of a congregation to the petition for a certificate, and especially to evade taking them into the incorporated body. Whether the act was passed from this motive or not, it certainly attempted to dispense with those requirements, and the reason for the attempt is clear. It must be inconvenient, if not mischievous, to include all the communicants of a congregation in an organic body. We have dwelt on the injustice of requiring a change of church polity as the condition of corporate existence, and it is to be considered that religious assemblies, unlike most non-mercenary associations, usually contain children who are unfit to share in the government of a corporation; far more so than they are to sign the petition for a certificate, and their incapacity to do this

137 App.—24

was remarked in North St. Louis, etc., Church v. Mc-Gowan, 72 Mo. 279, 287.    Nevertheless, the Supreme Court in said case frustrated the purpose of the amendment by construing it in connection with section 2 of the Act of 1868 (1 Wag. Stat., art. 8, sec. 1) and holding that by force of the latter section, the law continued to confer membership in the corporation on every member of the congregation.    The statutes thus construed must have worked unsatisfactorily; for in the revision of 1879, and after the announcement of the decision in North St. Louis, etc., Church v. McGowan, radical alterations were made in the law, and we note the omission to require a list of the members of the association out of which the corporation arises.    The present statutes say "any number of persons, not less than three, who shall have associated themselves by articles of agreement in writing, as a society, company, association or organization formed for benevolent, religious, scientific, fraternal-beneficial or educational purposes, may be consolidated and united into a corporation. Such articles of agreement may be organic regulations, or a constitution, or other form of association." [R. S. 1879, sec. 970; 1 R. S. 1899, sec. 1394, art. 11, ch. 12.]    The next section provides the method of incorporating, which is for the president, secretary and treasurer or other chief officers, to submit articles of agreement with a petition praying for a *pro forma* decree.    As soon as the decree is granted, the Secretary of State must issue a certified copy of the articles of agreement and the appended certificates, and "thereupon the petitioners, their associates and successors shall be created and be a body politic."    From that language we understand the constituents of the corporation are the petitioners, such persons as they shall associate with them and their successors.    In section 1397 of the present statutes (1899) the classes of associations which may be organized under the article are enumerated, and include "any association, congregation, society or church organization formed for religious purposes,"

This section would permit an entire congregation to incorporate, but does not require it to do so; though we think if the form of church government was congregational, the law would compel the reception of every communicant, or at least every one of adult years, into the corporate body organized to control the policy and property of the church to which they belonged. Section 1400 says a body politic may be formed under the article to execute a trust, the purpose of which is within its purview, and to take title to any property, real or personal, for the purposes of such trust. By virtue of this section corporations may be formed, as the one under examination was, to execute trusts of property settled to the uses of churches and benevolent societies; and it looks improbable that the Legislature contemplated the necessity of admitting children to share in such a responsibility. The more reasonable view is that no inflexible methods of constituting membership and regulating the economy of the several species of corporations authorized by the article were prescribed, but the intention was for these matters to depend largely on the various purposes of the organized bodies, the duties they were to perform and the character of the voluntary associations out of which they would spring. Sometimes it will be proper or necessary for all the members of such assemblies to be united in the organic body, and sometimes this will be unnecessary, or, perhaps, impossible. The language employed in the several sections of the article is nowhere definite regarding who shall compose said body; but so far as this is implied, the implication seems to be that the subscribers to the articles of agreement and such persons as they may associate with them, shall be the corporators. It is certain no enumeration of the members of the congregation or other voluntary assembly is required, nor do we find any words which signify they shall be constituents of the corporation; and it was such a requirement that induced the Supreme Court in construing the Act of

1871, to hold the entire congregation composed the corporation. The constitutional and statutory alterations we have pointed out were not accidental, but purposive, and were made to give effect to a different policy from what had formerly prevailed. In our opinion the object was to endow religious societies and churches with corporate franchises and powers without sacrificing their established polity. We so conclude, mainly for two reasons: the Act of 1871, which initiated the departure in legislation, referred only to those associations, plainly sought to eliminate the necessity of submitting to majority rule in every instance, and when this purpose miscarried, other alterations in the law were made to realize it.

We hold the plaintiffs were neither members of the incorporated body known as Polish Roman Catholic St. Stanislaus Parish, nor entitled to a decree to confer membership on them. Hence the judgment will be affirmed. All concur.