STATE ex rel. A. M. J. HYNES, Relator, v. HOLY ROMAN APOSTOLIC CATHOLIC CHURCH et al., Respondents.

Kansas City Court of Appeals, June 13, 1914.

1. **MANDAMUS: Catholic Church: Priesthood: Regulations.** When one as a member of the Catholic Church enters upon the duties of Priesthood and is assigned to a certain pastorate, he necessarily agrees to abide by the rules and regulations of that church.

2. ———: **Ecclesiastical and Secular Jurisdiction.** Whatever pertains to the government of the Catholic Church, the discipline of its members, the place of exercise and duration of service of a priest, is within the jurisdiction of ecclesiastical tribunals to the exclusion of the secular courts of the country.

3. ———: **Jurisdiction: Property Right.** If a right of property is involved, the secular courts have jurisdiction, if necessary to determine and protect that right, to inquire into the rules and regulations of the church regarding such property.

4. ———: **Priest's Salary: Excommunication.** The salary of a priest who has been deposed or excommunicated, is not a property right and secular courts will not interfere with ecclesiastical tribunals, under the guise of protecting a priest in his salary.

Original Proceeding in Mandamus.

WRIT DISMISSED.

*Kenneth McC. Deweese* for relator.

*Johnson & Lucas* for respondents.

ELLISON, P. J.—The relator, A. M. J. Hynes, was formerly, and claims to be now, a priest in the Catholic church, duly ordained and incardinated into the Catholic diocese of Kansas City, Missouri. He charges that an attempt has been made by church officials to excommunicate him and that, in point of fact, such officials have deprived him of the exercise of the functions of his priesthood which, he states, consisted, in part, of his salary of $1600 per year and the life tenancy of the temporal property of the church in his parish; including lots eighteen, nineteen and twenty in Burke's Addition to California, Moniteau county, Missouri. He therefore begun this proceeding in mandamus to compel respondent Thomas F. Lillis, bishop of the diocese of Kansas City and successor in office and authority to John J. Hogan deceased, to restore him to the possession and enjoyment of these things of which he has been deprived. An alternative writ was issued and the respondent has demurred thereto.

Stripped of historical allegation concerning the Holy Roman Catholic Apostolic church, the complaint set forth in relator's petition which has become incor-

porated into the writ demurred to, is that relator was the incumbent priest "in the parish of the Annunciation" at the town of California in this State. That as such, he was in possession of the church building and the parish property, and that he administered the spiritual office of priest as well as the temporal duties connected therewith, for which he received a salary of $1600 per annum and enjoyed the occupancy of the parish property, including the parish house or residence. The complaint set up continues thus: "That on the 29th day of March, 1909, contriving to wrongfully deprive petitioner of his said office and the emoluments thereto pertaining and belonging, and of the said church and parish house and "living" as aforesaid, and also to deprive the petitioner of the solace, comfort and consolation of the sacraments. of said church, in violation of his office, and to bring petitioner to penury and want without charge, accusation, notice, hearing or trial, and contrary to the canons of said church the said John Joseph Hogan, as bishop of said diocese wrongfully, and unlawfully fulminated and promulgated a declaration of excommunication against your petitioner in words and figures as follows:

'In the Name of the Father, and of the Son, and of the Holy Ghost. Amen.

Whereas, It is well known from public documents that the priest, Rev. A. M. J. Hynes, of the diocese of Kansas City, has caused a writ to issue of date March 20, 1909, commanding the sheriff of Jackson county, Missouri, to summons the Right Rev. John J. Hogan, Bishop of Kansas City to appear before the Circuit Court of California, Moniteau County, Missouri, to answer the petition of said Rev. A. M. J. Hynes; and whereas, this procedure by an ecclesiastic against an ecclesiastic, contrary to the general disposal of the sacred canons, is forbidden under penalty of excommunication, incurred *ipso facto,* as provided

by Section Seven of the Constitution *Apostolicae Sedis*.
We therefore declare that the aforesaid Rev. A. M. J.
Hynes has incurred excommunication which is reserved
to the Holy see, and hereby give notice that he cannot
be absolved from such censure by any priest unless
authorized by the Holy See.

Given from our residence at Kansas City, Mis-
souri, this 29th day of March, 1909.

E. ZECHENTER, Chancellor.

JOHN J. HOGAN,
Bishop of Kansas City.'

thereby undertaking to deprive the petitioner of his
liberty, and property without due process of law, and
to deny to the petitioner the equal protection of the
laws of said church contrary to the fundamental prin-
ciples of all civilized governments of the world, by
reason of which petitioner has suffered injury to his
great loss, cost and damage.''

It is then charged that this declaration of excom-
munication ''was and is void;'' and ''that it is pal-
pably erroneous; that it is grounded in gross fraud
and supported by falsehood, and that said John J.
Hogan, as Bishop, as aforesaid, was without lawful
power, authority or jurisdiction to utter, declare or
pronounce the same, and the petitioner states and
shows to the court that it is not true, as in said decla-
ration mentioned and recited that the said recited pro-
cedure by an ecclesiastic against an ecclesiastic, con-
trary to the general disposal of the Sacred Canons is
forbidden under penalty of excommunication incurred
*ipso facto* by Section Seven of the Constitution *Apos-
tolicae Sedis,* and that said recited procedure is and
was not contrary to the general disposal of the Sacred
Canons in such case made and provided, and is not
and was not forbidden under penalty of excommunica-
tion incurred *ipso facto* or otherwise, as therein de-
clared to be provided by Section Seven of the Con-

183 Mo. App.—13

stitution *Apostolicae Sedis,* nor any otherwise prohibited. The authentic words of Section Seven of the Constitution *Apoltolicae Sedis* are: "We, do therefore, declare to be excommunicated *ipso facto* (absolution from which is in a special manner reserved to the Roman Pontiff.)

VII. "Those constraining, directly or indirectly, lay judges to draw to their tribunals ecclesiastical persons contrary to the disposition of the canons; also those promulgating laws or decrees against the liberty or rights of the church."

"Your petitioner further shows that said Section Seven of said Constitution had long prior to the 29th day of March, 1909, received an authoritative interpretation and construction as to its meaning and application from the office of the Supreme Congregation of the Holy Roman Universal Inquisition by the Leonine Decree of the 23rd of January, 1886, which said decree had received the approval and confirmation of Pope Leo XIII, who decreed that the same be forwarded to every Ordinary throughout the world for his guiding rule, in and by which said decree it was among other things declared and determined that the Chapter *Cogentes,* meaning thereby said Section Seven of the Constitution *Apostolicae Sedis,* did affect legislators and other authorities and no others.

That a fair translation of said decree into English is as follows:

'Most Illustrious and Most Reverend Sir:

In the Constitution of Pius IX, of holy memory, which begins (thus) *Apostolicae Sedis moderationi,* dated the 12th of Oct., 1869, it is provided that: Those constraining, directly or indirectly, lay judges to draw to their tribunals ecclesiastical persons contrary to the dispositions of the canons; as also, those promulgating laws or decrees against the liberty or rights of the church; do incur excommunication, absolution from

which is, in a special manner reserved to the Roman Pontiff. Now, since doubts have frequently arisen about the real sense and meaning of this chapter, this Supreme Congregation of the Holy Roman and Universal Inquisition has often declared (determined and decreed) that chapter *Cogentes* affects legislators and other authorities, who constrain, directly or indirectly lay judges to draw to their tribunals ecclesiastical persons contrary to the dispositions of the canons; and no others. Furthermore, Our Most Holy Lord, Pope Leo XIII, has approved and confirmed this declaration; hence this Supreme Congregation has decreed that the same be forwarded to every Ordinary (throughout the world) for his guiding rule.

If in those countries, however, where the *Privilegium Fori* has been in nothing modified by the Pontiffs, it so happen that one cannot pursue his rights except before lay judges, he is to first ask permission of his Ordinary to sue a cleric in a lay forum; this permission shall never be refused by the Ordinary, and especially in case he, the said Ordinary, has endeavored to bring about an agreement between the parties without success; but to sue bishops in that forum is not allowed without permission of the Apostolic See.

And if anyone shall dare to sue before lay judge or judges a cleric, without permission of the Ordinary, or a bishop without permission of the Holy See, it is in the power of his Ordinary to visit him, especially if he be a cleric, with punishment and censure, *ferenda sententia,* as a violator of the *privilegium fori;* if in the Lord he shall judge that the case demand it. Wishing you much happiness in the Lord, I am, Given at Rome this 23rd day of January, A. D. 1886, Yours most affectionately in the Lord,

R. CARD. MONACO.' "

It is then alleged that this decree of interpretation is final and irrevocable. It is then alleged that the

diocese of Kansas City is a part of the "Roman Catholic Province of St. Louis; that the Roman Catholic Archbishop of St. Louis is Metropolitan of said Province with appellate jurisdiction in matters ecclesiastical over the dioceses of said Province;" that the petitioner took his appeal from the judgment or pronouncement of excommunication on the 15th of October, 1909, to said archbishop at St. Louis who from that day on has neglected "to pass on said matter."

It is then alleged that on the 24th of November, 1910, one P. P. Rosch and divers others, in the nighttime and in his temporary absence, with force broke in the doors and windows of the church and carried away "the goods of petitioner," and that such persons forcibly took possession of the real property of the church including the parsonage aforesaid and have kept petitioner out of possession by putting him in bodily fear through the use of words and actions of a tendency to cause him to become afraid, and have frightened him so that he dare not return to such property, and such persons by such means are now in possession of the property. By reason of all which said Rosch and others have made "forcible entry and unlawful detainer and do now keep the said real estate afainst the peace and dignity of the State of Missouri." It is then alleged that said Rosch is an ordained priest of the Catholic church and that he, upon the appointment of respondent Lillis, Bishop as aforesaid, is exercising the functions of priesthood belonging rightfully to relator and that he is using the church and other property for the worship of God according to the rites and ceremonies of the Catholic church. Demand is then alleged to have been made on the respondent Lillis, as Bishop aforesaid, that he forewith restore relator as "parish priest and to restore him to the possession of the church and altar and the parsonage house with all the privileges and functions thereto belonging; and such demand has been ignored.

The substance of the foregoing statement of the complaint of relator is that he was the officiating priest of the Catholic church at California, Missouri. That he was wrongfully and fraudulently excommunicated and the possession of the Church building and parsonage was taken from him by force and that he has been superceded in his service as parish priest by the Reverend Rosch and that by these proceedings he has been deprived of his salary, and the relief he claims is reinstatement.

When relator as a member of the Catholic church entered upon the service and the discharge of the duties of priesthood assigned to a certain pastorate, he necessarily agreed to abide by the rules and regulations of that church. Whatever pertained to the government of the church, the discipline of its members and the duration of service and place of its exercise, of the priesthood must necessarily be within the jurisdiction of the ecclesiastical tribunal to the exclusion of the secular courts of the country. Otherwise the latter courts would be supervising the assignment of priests and the duration of their incumbency. Primarily the church and its government has to do with the laws of God, administered for the orderly enjoyment of obedience to His Will as understood by that church. It is a life and a law with which the courts, as such, have no concern, however vital may be the interest of the personnel of such courts. In Watson v. Garvin, 54 Mo. 353, 378, it was said that, "The true ground why civil courts do not interfere with the decrees of ecclesiastical courts, where no property rights are involved, is not because such decrees are final and conclusive, but because they have no jurisdiction whatever in such matters, and cannot take cognizance of them at all, whether they have been adjudicated or not by those tribunals. This principle forms the foundation of religious liberty in Republican governments. The

civil authorities have no power to pass or enforce laws abridging the freedom of the citizen in this regard, and hence, in matters purely religious or ecclesiastical, the civil courts have no jurisdiction."

If a right of property be concerned, jurisdiction of secular courts will attach under the general law, though it involves the construction of the rules and regulations pertaining to ecclesiastical polity. This is for the reason that in this country all organizations, ecclesiastical or secular, are subordinate to the law of the land in all secular matters; and a church organization, acting through its constituted authority, can no more deprive one of his property without due observance of the principles of law, than it could take from him his life or liberty.

The jurisdiction to determine the relation between pastor and the church is with the constituted authority of the church. [Nance v. Busby, 91 Tenn. 303.] When the removal of a minister has "been made under authority of the church discipline, the courts will not inquire into its regularity or validity." [Travers v. Abbey, 104 Tenn. 665.] In Watson v. Jones, 13 Wall. 679, 727, the Supreme Court of the United States said, "that whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." At page 728 that court continued: "The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves

to such a body do so with an implied consent to this government and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.'' And at page 733, this further is said: ''It is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the *criteria* by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord Eldon, and would, in effect, transfer to the civil courts where property rights were concerned the decision of all ecclesiastical questions.''

In Shannon v. Frost, 3 B. Monroe (258, 259) the following expression of the Supreme Court of Kentucky has been frequently reproduced in proper cases; in none more appropriate than this: ''This court, having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline or excision. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. And these we must decide, as we do all other civil controversies brought to this tri-

bunal for ultimate decision. We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly cut off from the body of the church.''
. . . ''The judicial eye of the civil authority of this land of religious liberty, cannot penetrate the veil of the church, nor can the arm of this court either rend or touch that veil for the forbidden purpose of vindicating the alleged wrongs of the excinded members. When they became members they did so on the condition of continuing or not, as themselves and their church might determine. In that respect they voluntarily subjected themselves to the ecclesiastical power, and cannot invoke the supervision or control of that jurisdiction by this or any other civil tribunal.''

We take the following from Harmon v. Dreher, 1 Spear Eq. (S. C.) 87, 120, relating to the dismissal of Dreher, a minister, by a religious body. It bears directly on the case relator presents to us: ''He stands, therefore, convicted of the offenses alleged against him, by the sentence of the spiritual body, of which he was a voluntary member, and whose proceedings he had bound himself to abide. It belongs not to the civil power to enter into or review the proceedings of a spiritual court. The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of the civil authority. The judgments, therefore, of religious associations, bearing upon their own members, are not examinable here; and I am not to inquire whether the doctrines attributed to Mr. Dreher, were held by him, or, whether, if held, they were anti-Lutheran; or, whether his conduct was, or was not, in accordance with the duty he owed to the synod, or to his denominations. I have stated the facts, and I have stated the judgment rendered on the facts,

and that judgment must be conclusive here.  The effect
of this judgment is not weakened by the general ex-
pressions in the constitution, and in the annual jour-
nals of the synod, that the power of the body is merely
advisory.  In fact, in this country, no ecclesiastical
body has any power to enforce its decisions by tem-
poral sanctions.  Such decisions are in this sense ad-
visory—that they are addressed to the conscience of
those who have voluntarily subjected themselves to
their spiritual sway; and, except where civil rights are
dependent upon them, can have no influence beyond the
tribunal from which they emanate.  Where a civil right
depends upon an ecclesiastical matter, it is the civil
court, and not the ecclesiastical, which is to decide.
The civil tribunal tries the civil right, and no more,
taking the ecclesiastical decisions, out of which the
right arises, as it finds them.  Just as ecclesiastical
forums would be bound to regard the decisions of a
temporal court, where a religious controversy springs
out of it, and is to be decided by them.''

Questions of jurisdiction have been discussed by
our Supreme Court in a number of cases:  Watson v.
Garvin, 54 Mo. 353; Prickett v. Wells, 117 Mo. 502;
Fulbright v. Higginbotham, 133 Mo. 668; Russie v.
Brazzell, 128 Mo. 93.  These were reviewed in the re-
cent case of Boyles v. Roberts, 222 Mo. 613.  By con-
sulting that case it will be seen the rule is firmly es-
tablished in this State to the effect that matters of
faith and belief, matters affecting church discipline
and government, the relation of the church to its mem-
bers, and its pastors and priests, the origin and end
of such relations, belong exclusively to the church and
its appointed tribunals; that civil tribunals hold aloof
from controversies in ecclesiastical bodies, except when
such controversies involve property rights.  When the
latter is involved, it is held and emphasized in Boyle
v. Roberts, supra, that if it becomes necessary in or-

der to determine *that* right, the civil court will examine for itself the regularity and validity of the ecclesiastical proceedings as they may affect such right.

Doubtless in view of that rule of law, relator insists he had a right of property which has been destroyed. Manifestly he had no right or title to the church building or its furnishings. Nor had he any property in the building known as the priest's residence. He says he had a living in the salary of the priest in charge of the church and in the occupancy of the residence. But a salary to him was not a matter of contract and it depended altogether upon *his rightful incumbency* as priest. "The pastor has no property right in his salary as against the church;" Travers v. Abbey, 104 Tenn. 665, 669; Nance v. Busby, 91 Tenn. 303, 324. If he has been removed under authority of the church discipline his right ends.

In Stack v. O'Hara, 98 Pa. St. 213, 235, the Supreme Court of Pennsylvania said: "It would be a grievous wrong to the church to rule that its priests and ministers are exempt from its proper discipline and authority, because of their profession. They have no property in such profession that is shielded from the consequences of their broken vows and compacts. They neither acquire nor hold it as they do land or chattels." To the same effect is Chase v. Cheney, 58 Ill. 509, 537-541.

Finally, by way of avoidance of what we have written, it is said that action taken by the church in order to enjoy freedom from civil interference, or supervision, must be matters over which it has acquired jurisdiction. That is only partly right. If the matter involved is not within the jurisdiction of the ecclesiastical body, though the regularity of the procedure is flawless, its action would be void. Thus, however regular the order of its proceedings might be, the church's judgment on the title of a members property,

or the security of his person, would be void. But, on the other hand, if the subject-matter is ecclesiastical, the jurisdiction exists in the ecclesiastical tribunal to decide upon the regularity and validity of the procedure. The complaining party, under this view, would doubtless, in some instances, be the victim of injustice; but those are matters for which there is nó cure. He would take the same risk of misfortune in a civil tribunal whose functions are administered by imperfect and erring humanity: Watson v. Farris, 45 Mo. 183, 197. The concurring (and dissenting) opinions of LAWRENCE and SHELDON, J. J. in Chase v. Cheney, above cited, shows what the understanding of the court was as to the right a pastor or priest has in his salary, and the jurisdiction of the ecclesiastical court. They say ''We understand the opinion as implying, that in the administration of ecclesiastical discipline, and where there is no other legal right of property involved than the loss of the clerical office or salary, as an incident to such discipline, a spiritual court is the exclusive judge of its own jurisdiction, under the laws and canons of the religious association to which it belongs and its decision of that question is binding upon secular courts.''

If relator has been unjustly dealt with by the officials and tribunals of his church he must appeal to them for justice. If his excommunication was unauthorized; if the interpretation made by the Leonine Decree of January 23, 1886, above set out, has been disregarded; if he has been proceeded against in a manner not in accord with the ecclesiastical procedure of his church which he thinks is jurisdictional, such tribunals must determine his and the church's right. Otherwise, if any minister or priest is deposed, or his services dispensed with, he may crowd the docket (for instances will be numerous) of civil tribunals as *reviewing* tribunals to discover if the proceedings have been regular and justice has been done from a secular

standpoint; thus running counter to the old English Statute, reading that "causes spiritual must be judged by judges of the spirituality, and causes temporal by temporal judges."

It is scarcely necessary to state that we think the cases in civil courts cited by relator concerning the rights of members of voluntary wordly associations, such as boards of trade, social, charitable, and insurance societies and the like, have no application to a case of this nature. We will also add that the foregoing considerations have made it unnecessary to refer to other points made in behalf of the demurrer to the writ, to the effect that the relator has other remedies by way of his undetermined appeal to the archbishop of St. Louis in the matter of his excommunication. With the concurrence of the other judges the demurrer will be sustained and the writ dismissed.