Charles **STRUEMPH**, Joseph **Struemph**, Johanna **Struemph**, Steve **Hoffman**, Marie **Hilke** and Martha **Kemna**, Respondents,

v.

Bishop Michael **McAULIFFE**, Appellant.

No. 46061.

Missouri Court of Appeals,
Eastern District,
Division Five.

Sept. 6, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Denied
Oct. 26, 1983.

Application to Transfer Denied
Jan. 17, 1984.

**560**

Louis Defeo, Jefferson City, for appellant.

Ronald R. McMillin, Jefferson City, for respondents.

ALMON H. MAUS, Special Judge.

The plaintiffs in this action are six members of the Holy Family Parish of the Roman Catholic Church of Freeburg, Missouri. This is a parish of the Diocese of Jefferson City. The defendants were the pastor of the parish and the Bishop of the Diocese. When the pastor was reassigned, he was dismissed as a party and the Bishop is now the only defendant. At issue is the extent of the authority of the Bishop over the church building and its contents and the fiscal affairs of the parish. A brief resume of the evidence will be sufficient to cast the background of the controversy.

Holy Family Parish was established in 1904. In 1904 the real property involved was conveyed to the Archbishop of St. Louis, or his lawful successor. It is conceded title now stands in the name of the defendant Bishop. By 1919 the initial church building had become inadequate. A new church was built by the efforts of the parishioners. Those efforts included not only the contribution of money, but physical labor in the construction. Adults and children alike participated. The ancestors of some of the plaintiffs so contributed. The result was a church of architectural distinction and great beauty. The new church was dedicated in 1921. It has become known as the Cathedral of the Ozarks. It has been a source of pleasure and pride to the parishioners, including the plaintiffs.

The main altar of the church is located, as customary, against the front wall of the church. It is most impressive. It projects reverence and beauty even to the untrained eye. Sometime between 1921 and 1940, additional altars were constructed on the left and right of the main altar. One side altar was donated by the father of one of the plaintiffs.

The Second Vatican Council changed certain liturgical practices of the Roman Catholic Church. Mass was formerly celebrated

at the main altar. For the last several years Mass has been celebrated only at an additional altar, the altar of sacrifice. The altar of sacrifice was located several feet in front of the main altar. In celebrating Mass at this altar the priest faces the congregation. The hierarchy of the Catholic Church determined that the furnishings of churches should be arranged to focus attention upon the altar of sacrifice. To this end, it is "highly recommended that side altars be removed so that they do not distract from the liturgical unity and centrality of the one altar of sacrifice." Guidelines for Building and Renovating Churches, p. 10. In many churches built before the Second Vatican Council not only side altars, but main altars have been removed.

As a result of the Second Vatican Council, the Holy Family Parish has a parish council. The council consists of thirteen persons elected by parish members, and ex-officio, the pastor and one of the sisters of the parish school. The general purpose is to increase parishioner's participation in the affairs of the parish and to serve as a consultative body to the parish priest. The constitution and by-laws of the council acknowledge its advisory status and the ultimate authority of the hierarchy. The by-laws expressly state the decisions of the council must be ratified by the pastor. There is provision for appeal within the hierarchy.

For sometime before November, 1977, there had been general discussion of possible changes in the altars of the church. This included a presentation to the parishioners. Parishioners' opposition to change developed. In a November, 1977 meeting, the pastor presented a proposed plan to the council. At that meeting and at a subsequent meeting, a majority of the council voted against that and other plans. The initial vote included a proposition that if there were further proposed changes, a vote of the parishioners should be taken. The pastor vetoed these resolutions of the council. A subsequent council meeting was attended by the Bishop. Petitions bearing the signatures of approximately 200 parishioners were presented at that meeting.

The petitions were directed to the parish council, urging them to vote in favor of preserving the main altar and side altars and location of the altar of sacrifice. The petitions were received by the Bishop.

Amended proposals of change were presented at this meeting. The council expressed itself as having no alternative but to accede to the proposals of the pastor and Bishop. Under these proposals, the main altar was to remain intact. However, the council made five recommendations which included removing only the reredos of the side altars and storing them. The pastor approved the recommendations with the exception of those dealing with the relocation of the altar of sacrifice and front pews. After discussion, the Bishop determined, as reflected in the council's minutes, that issue should be settled in the following manner: "Experiment with both arrangements of the altar and pews for a period of 60 days on each arrangement. At the end of both experiments conduct a 'survey' or 'straw vote' of the parishioners to see which floor arrangement they would prefer. The council would then make the final decision, guided by the findings of the survey."

On August 19, 1978, a truck and crew arrived at the church. The pastor accompanied the crew. The trial court found their purpose was to remove the altars. However, there is no direct evidence of that purpose before this court. One of the plaintiffs testified: "Some of the parishioners actually stood before the altar or would not let the movers in to remove that particular portion that they were supposed to move." This could have had reference to the relocation of the altar of sacrifice. Unfortunately, neither the pastor nor Bishop was asked about the movers' purpose. The cryptic quoted testimony was not further clarified. Nonetheless, the path of the pastor and the crew was blocked by six or eight parishioners. Those present included at least one of the plaintiffs. Tempers flared and heated words were exchanged. To a police officer who arrived at the scene, violence seemed imminent. The pastor and the crew withdrew.

The plaintiffs' petition is in three counts. Count I seeks an injunction prohibiting the removal of the main and side altars and relocation of the altar of sacrifice. Count II asserted that "[a]s a result of defendants' conduct, plaintiffs and other members of the Parish Church would be deprived of their right to conduct the business and government of said church" and prayed for an accounting and general relief. Count III seeks a judgment declaring the plaintiffs, through the Holy Family Parish Council, are entitled to a periodic accounting and are entitled to control physical changes in the building and its contents.

Count I was severed and a separate trial held thereon. Rule 66.02. The trial court made findings of fact in general within the perimeter of the above resume. However, those findings pointedly omit reference to the recommendations of the parish council and their acceptance by the pastor and Bishop, as outlined above. Those findings do include the statement the purpose of the truck and crew was "to remove the altars from the church." As reviewed above, there is no evidence to support the finding of the court concerning the purpose of the movers.

The trial court's conclusions of law include the following. The First Amendment to the Constitution of the United States does not require a state to accord "automatic deference to religious authority in resolving church property disputes." That "[a]s a means of adjudicating a church property dispute, a state court is constitutionally mandated to adopt a 'neutral principles of law' analysis . . . ." The initial deed to the Archbishop or his lawful successor created a trust. "Using the canonical terms the 'moral person' at the parish level is the cestui que [sic]." Further, taking the petition referred to "as indicative of the will of the cestui que, it appears that the cestui que desire the side altars with reredos intact."

The judgment permanently enjoined the Bishop from "removing the main altar from its site in the sanctuary . . . ." It further directed the defendants to restore the side altars, with reredos, to their position in the sanctuary. This judgment was made final for purposes of appeal.

This case presents for resolution litigation arising within a church organization. To bring the precise issue into focus and for proper consideration of the authorities, it is well to observe some factual variations presented by and general principles applicable to litigation involving church organizations. Such litigation may involve a general church organization or a local church. The church may be hierarchical or congregational. If hierarchical, it may have the presbyterian or the episcopal form of government. It may involve the schism of a local church from a general church organization. It may present a schism within a local church. Or, it may, as in this case, involve the right of control within a church organization.

▪ The First Amendment in part provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." From this has been derived the constitutional mandate that civil courts have no authority to decide controversies over ecclesiastical matters. *Murr v. Maxwell,* 232 S.W.2d 219 (Mo.App.1950); *Longmeyer v. Payne,* 205 S.W.2d 263 (Mo.App.1947); *Hynes v. Lillis,* 183 Mo.App. 190, 170 S.W. 396 (1914). However, it is generally acknowledged that civil courts must resolve property disputes even though they involve church organizations. *Fulbright v. Higginbotham,* 133 Mo. 668, 34 S.W. 875 (1896). This is true even though such disputes may often stem from the action of ecclesiastical authorities. *Williams v. Wilder,* 397 S.W.2d 696 (Mo.App. 1965). The constitutional boundary restraining the authority of the civil courts is difficult of demarcation. In *Kedroff v. Saint Nicholas Cathedral,* 344 U.S. 94, 115, 73 S.Ct. 143, 154, 97 L.Ed. 120, 136 (1952), the court said, "the right to use St. Nicholas Cathedral is strictly a matter of ecclesiastical government, . . . to appoint the ruling hierarch of the archdiocese of North America." This statement prompted the following observation. "Perhaps the conclusion implicitly recognized that the distinction be-

tween religious and property rights is sometimes illusory and merely a pragmatic way to resolve aspects of a dispute that affect the orderliness of society." Sirico, Jr., The Constitutional Dimensions of Church Property Disputes, 50 Wash.U.L.Q. 1, 28 (1981).

This case also demonstrates the obscurity of that boundary. The plaintiffs contend the existence and location of the altars is a property right. The defendant asserts the altars are an essential part of worship and the controversy is purely ecclesiastical. Without actually deciding the same to be true, the court will consider the case as if it involves a property right.

The first step in the demarcation of that constitutional boundary was *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872). While that case was not decided on a constitutional basis, the principles it enunciated have subsequently been declared to be so founded. *Kedroff v. Saint Nicholas Cathedral*, supra; *Presbyterian Church v. Hull Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). *Watson v. Jones*, supra, involved a schism within a local Presbyterian church. The court recognized three factual circumstances encountered in determining the right to control property devoted to religious purposes. The first involves property held under an express trust.

> The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority. The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization. *Watson v. Jones*, supra, 80 U.S. (13 Wall.) at 722, 20 L.Ed. at 674.

The ordinary principles governing voluntary associations were declared applicable to churches belonging to class two. In regard to churches within class three the court said:

> The right to organize voluntary religious associations to assist in the express decision of controverted questions of faith within the association and for the ecclesiastical government of all the individual members, congregations and officers within the general association is unquestioned. *All who united themselves to such a body do so with an implied consent to this government, and are bound to submit to it.* But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed (emphasis added). *Watson v. Jones*, supra, 80 U.S. at 726–729, 20 L.Ed. at 676–677.

The court then found the Presbyterian church to have the hierarchical form of government categorized in class three. The decision of the General Assembly concerning the faction entitled to the property was held to be conclusive.

The guidelines for the determination of such property rights were developed in Missouri at an early date based upon the classifications in *Watson v. Jones*, supra.

> One joining an organized society such as a church having a representative form of government under the supervisions and control of judicatories known as church courts agrees by the act of membership to abide by the rules, orders and judgments of such courts properly made, and consents that whatever rights and privileges he may possess as a member shall be controlled by such rules, orders, and judgments. . . .
>
> In view of the relation above defined which the individual bears to the church, it follows that the powers granted to the General Assembly and presbyteries, when exercised by them, are binding upon all of the members, regardless of whether the action meets with their approval or not. The alternative of those who disapprove is simply withdrawal from the organiza-

tion, for the fact of membership implies an agreement to abide by the actions of the governing body. *Hayes v. Manning,* supra, 263 Mo. 1, 33–34, 172 S.W. 897, 902–903 (banc 1914).

In *Klix v. Polish Roman Catholic St. Stanislaus Parish,* 137 Mo.App. 347, 118 S.W. 1171 (1909), the court clearly held that in the Roman Catholic Church control is vested in the hierarchy. The hierarchical structure of the Roman Catholic Church has also been recognized in *Olear v. Haniak,* 235 Mo.App. 249, 131 S.W.2d 375 (1939); *Hynes v. Lillis,* supra.

On the other hand, if a church is congregational in organization, within the second class categorized in *Watson v. Jones,* supra, it has been consistently held that control is vested in a majority of its members. *Fulbright v. Higginbotham,* supra; *Russie v. Brazzell,* 128 Mo. 93, 30 S.W. 526 (1895); *Prickett v. Wells,* 117 Mo. 502, 24 S.W. 52 (1893); *Clevenger v. McAfee,* 237 Mo.App. 1077, 170 S.W.2d 424 (1943). However, numerous cases restricted that control in the event of schism and a substantial departure from an established doctrine. In such instances, it was said to be the duty of the court to "award the property to the parties, whether in the majority or the minority, who have adhered to the doctrine and faith which existed prior to the schism or diversion." *Boyles v. Roberts,* 222 Mo. 613, 654, 121 S.W. 805, 813 (banc 1909). Also see *Lewis v. Wolfe,* 413 S.W.2d 314 (Mo.App. 1967); *Mills v. Yount,* 393 S.W.2d 96 (Mo. App.1965); *Montgomery v. Snyder,* 320 S.W.2d 283 (Mo.App.1958); *Mertz v. Schaeffer,* 271 S.W.2d 238 (Mo.App.1954); *Trett v. Lambeth,* 195 S.W.2d 524 (Mo.App. 1946). But see *Hayes v. Manning,* supra; *Turpin v. Bagby,* 138 Mo. 7, 39 S.W. 455 (1887). The courts have determined the regularity of the procedure employed in the exercise of control by a majority. *Fast v. Smyth,* 527 S.W.2d 673 (Mo.App.1975); *Trett v. Lambeth,* supra; *Briscoe v. Williams,* 192 S.W.2d 643 (Mo.App.1946); *Stone v. Bogue,* 181 S.W.2d 187 (Mo.App.1944).

Following *Watson v. Jones,* supra, federal constitutional limitations upon the authority of the states to establish standards for the determination of the right to control the use of property devoted to religious purposes have been the subject of a series of decisions of the Supreme Court of the United States. A review of all those decisions is not necessary for the determination of this case. Excellent reviews are found in Adams and Hanlon, *Jones v. Wolf:* Church Autonomy and the Religion Clauses of the First Amendment, 128 U.Pa. 1291 (1980); Sirico, Jr., The Constitutional Dimensions of Church Property Disputes, supra, 50 Wash. U.L.Q. 1. However, for a better understanding of *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the prior decision of *Presbyterian Church v. Hull Church,* supra, should be noted.

In that case the general church involved was a hierarchical organization of churches with the presbyterian type of government. Because of doctrinal differences, the congregations of two local churches voted for secession. Litigation contesting the right to control the property of those two churches "was submitted to the jury on the theory that Georgia law implies a trust of local church property for the benefit of the general church on the sole condition that the general church adhere to its tenets of faith and practice existing at the time of affiliation by the local churches." *Presbyterian Church v. Hull Church,* supra, 393 U.S. at 443, 89 S.Ct. at 603, 21 L.Ed.2d at 662. Upon a jury's determination the actions of the general church constituted a substantial abandonment of those tenets, the implied trust was terminated. The general church was enjoined from interfering with the use of the property. In approving and after quoting a portion of *Watson v. Jones,* supra, the court declared "[t]he logic of this language leaves the civil courts *no* role in determining ecclesiastical questions in the process of resolving property disputes." *Presbyterian Church v. Hull Church,* supra, 393 U.S. at 447, 89 S.Ct. at 605, 21 L.Ed.2d at 664. "[T]he departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion—the interpretation of particular

church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role." *Presbyterian Church v. Hull Church,* supra, 393 U.S. at 450, 89 S.Ct. at 607, 21 L.Ed.2d at 666. The annulment of the authority of the general church on the basis of a departure from doctrine was held to be an impermissible intrusion into ecclesiastical affairs. In so holding the court observed "[a]nd there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church v. Hull Church,* supra, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665.

In the most recent case, *Jones v. Wolf,* supra, a majority of the members of a local church affiliated with the Presbyterian Church in the United States voted to affiliate with another denomination. The General Assembly, through an Administrative Commission, determined the minority followed the true faith and were entitled to the use of the property held in the name of trustees for the local church. The Georgia Supreme Court determined the issue by the application of neutral principles of law. That court considered the deeds to the property, state statutes dealing with implied trusts and the Book of Church Order and determined there was no basis for a trust in favor of the general church. The use of the property was awarded upon the basis of the legal title to the property.

The minority contended that the courts of Georgia were required to defer to the decision of the General Assembly. Without analyzing the hierarchical structure of the general church, and referring only to *Watson v. Jones,* supra, in a footnote, the majority opinion held Georgia was "constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Jones v. Wolf,* supra, 443 U.S. at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785. In responding to the adherence of the dissent to *Watson v. Jones,* the majority opinion states:

Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. *Jones v. Wolf,* supra, 443 U.S. at 606, 99 S.Ct. at 3027, 61 L.Ed.2d at 786.

The first statement seems to imply that if a neutral-principles approach is adopted, ultimate control of property titled in a local church can be vested in a hierarchy by documents employing language of express trusts or reversions. The meaning of the alternative statement is not clear. It may have reference to a trust conditioned upon adherence to a denomination, in the sense of a doctrine of belief. The case was remanded for a determination if, under neutral principles, the law of Georgia provides that the identity of the local church is to be determined in accordance with the laws and regulations of the general church.

As noted, the trial court, apparently so interpreting *Jones v. Wolf,* supra, declared "[a]s a means of adjudicating a church property dispute, a state court is constitutionally mandated to adopt a 'neutral principles of law' analysis . . . ." This was error. In that decision the United States Supreme Court did not decide that the right to control the use of property titled in a Bishop of the Roman Catholic Church must be determined upon the neutral principles therein referred to. "Subject to these limitations, however, the First Amendment does not dictate that a State must follow a particular method of resolving church property disputes." *Jones v. Wolf,* supra, 443 U.S. at 602, 99 S.Ct. at 3025, 61 L.Ed.2d at 784. A state may yet observe the rule of deference applicable to a hierarchical church as enunciated in *Watson v. Jones,* supra; *Presbytery of Baltimore v. Babcock Memorial,* 52 Md.App. 428, 449 A.2d 1190

(1982); *Bennison v. Sharp,* 121 Mich.App. 705, 329 N.W.2d 466 (1983); *Tea v. Protestant Episcopal Church, Etc.,* 96 Nev. 399, 610 P.2d 182 (1980); *Southside Tabernacle v. Pentecostal, Etc.,* 32 Wash.App. 814, 650 P.2d 231 (1982). There is a distinction between establishing a religion and taking cognizance of the fundamental discipline of a church as established by its founders. To fail to respect that discipline could lead to the diversion of assets dedicated over the centuries to cherished beliefs. See *Skelton v. Word Chapel, Inc.,* 130 Ariz. 543, 637 P.2d 753 (Ariz.App.1981).

■ The rule of deference to the decisions of the ecclesiastical authorities of a hierarchical church is well established in Missouri. The evidence in this case "proves there is a graded hierarchy in the Catholic Church, extending from the priests of parishes through bishops and archbishops to the Roman See; and, as said, the higher clericals, and not the congregation, hold title to and manage temporalities." *Klix v. Polish Roman Catholic St. Stanislaus Parish,* supra, 137 Mo.App. 347, 363–364, 118 S.W. 1171, 1176 (1909). The observations of this court in 1909 are equally valid today.

Many religious sects, and among them the Roman Catholic, are of world-wide extent and vast membership, with congregations, parishes and established hierarchies and councils in every land. For ages they have observed a uniform polity, not only in spiritual matters, but in the transaction of secular business and the management of their properties. To force upon them an unaccustomed economy would introduce confusion and embarrassment; whereas to refuse them corporate capacity, except on the condition of renouncing their customs, would be illiberal treatment by the state. The record indicates that in the Roman Catholic communion, the titles to church possessions are vested in the bishops and archbishops, who manage them, either directly or through the parish priests, and without participation by the congregation. A statutory alteration of the form of church government may not constitute interference with matters of faith, yet, nevertheless, the right of every religious sect to preserve the peculiar economy it prefers, and perhaps has obeyed immemorially, touches closely, if it is not part of it, that religious freedom which American Constitutions guarantee. *Klix v. Polish Roman Catholic St. Stanislaus Parish,* supra, 137 Mo.App. at 362, 118 S.W. at 1176.

The rule of deference is peculiarly applicable to and is indeed a part of the structure of the Roman Catholic Church. The plaintiffs have not demonstrated any reason it cannot or should not continue to be so applied. The rule of deference to the decisions of the clerical authorities of the Roman Catholic Church is yet the law in this state. Also see *Parent v. Roman Catholic Bishop of Portland,* 436 A.2d 888 (Me.1981); *Bennison v. Sharp,* supra; *Tea v. Protestant Episcopal Church, Etc.,* supra.

However, it is appropriate to consider the possible application of the doctrine of neutral principles to this case. As developed in *Jones v. Wolf,* supra, that doctrine is couched in terms of express trusts and reversions. It appears difficult of application when there is no actual schism within the church. When the question is the right of control of property as distinguished from the vesting of title, the issue is resolved by a determination the hierarchical structure of the church extends to the control of property. "On close examination, no meaningful distinction can be drawn between the process of determining whether the parties meant to create a trust in favor of the general church and that of deciding in whom the parties intended to place ultimate authority over the church property." Adams and Hanlon, *Jones v. Wolf:* Church Autonomy and The Religion Clauses of the First Amendment, supra, 128 U.Pa. at 1323.

■ Nonetheless, considering the status of the title to the property in question under neutral principles as so developed, the trial court erred. That method is said to rely "exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges.... [A] civil court must take special care to scruti-

nize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Jones v. Wolf,* supra, 443 U.S. at 603–604, 99 S.Ct. at 3025–3026, 61 L.Ed.2d at 785. In applying that doctrine, a court may consider not only the deeds and statutes, but relevant church documents as outlined in the cases. *Jones v. Wolf,* supra; *New York Annual Conference, Etc. v. Fisher,* 182 Conn. 272, 438 A.2d 62 (1980); *Presbytery of Baltimore v. Babcock Memorial,* supra; *Southside Tabernacle v. Pentecostal, Etc.,* supra. Title to the property in question is vested in the Bishop. An expert in canon and civil law testified the canons of the church control the use of property standing in the name of the Bishop. Canon 1499 # 2 does provide: "Under supreme authority of the Apostolic See, the ownership of property belongs to that moral person which has legitimately acquired it." As stated, the trial court found the "moral person" was the parish and concluded the parishioners could exercise some control over the property in the name of the Bishop. It is beyond the scope of this opinion to attempt a statement of the full meaning of "moral person" as that term is used in the Roman Catholic faith. The finding of the trial court is a misunderstanding of that meaning. It is sufficient to say that scrutiny of the documents in purely secular terms provides no basis for finding any control of that property to be vested in the parishioners. Such scrutiny of the canons offered in evidence clearly reveals that the property is held subject to the control of the hierarchy of the church.

The judgment of the trial court on Count I is reversed and that count is dismissed. What has been said in this opinion should control the disposition of the remaining two counts.

DOWD, C.J., and ROBERT L. CAMPBELL, Special Judge, concur.