**James R. ROLFE, George Wilkin, Edward R. Sechrest, Jr., Eddie Lee, and Church Of Christ "With The Elijah Message," Appellants,**

v.

**James PARKER, John O'Keefe, and Ernest E. Fife, Respondents.**

**No. WD 53510.**

Missouri Court of Appeals, Western District.

April 21, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1998.

Scott Turner, Kansas City, for Appellants.

Debra Snoke, Independence, for Respondents.

HANNA, Judge.

The appellants in this matter are James R. Rolfe, George Wilken, Edward R. Sechrest, Jr., and Eddie Lee (Rolfe-group). They contend that they were improperly removed from their positions at the Church of Christ "With the Elijah Message" Established Anew 1929, Inc. (Church) by the respondents James Parker, John O'Keefe, and Ernest Fife (Parker-group). The Church is incorporated as a general not-for-profit corporation with its principal place of business at 608 Lacy Rd., Independence.

**Legal History:**

On or about March 5, 1996, the Rolfe-group filed a motion for preliminary injunction, petition for injunction and declaratory relief, and petition for accounting against the Parker-group in the Jackson County Circuit Court. On April 2, 1996, the Honorable Preston Dean found that it was unlikely that the Rolfe-group would be successful, in that the court lacked subject matter jurisdiction, and refused to issue the preliminary injunction. On June 11, 1996, Sterling National Bank filed a petition for interpleader to determine which party was entitled to the funds held by Sterling Bank. In September 1996, a three day bench trial was held before Judge Dean. On October 15, 1996, the court refused to grant relief to the Rolfe-group and dismissed the petition, because the issue of who constituted the authority of the Church, was an "ecclesiastical" matter and, therefore, not within the jurisdiction of the civil courts. The court also directed that the impleaded funds from Sterling Bank be paid to the Parker-group.

**Facts:**

The facts regarding this dispute commenced in 1994, when three of the Church's apostles were removed from their positions.[1] Several of the same parties involved in this matter took their grievances to the Jackson County Circuit Court where the court re-

---

1. Pursuant to Church doctrine, there are various levels of priesthood within the Church, beginning with deacon and rising to priest, elder, evangelist, vice-bishop, disciple, bishop and apostle. The highest office of the Church is that of an apostle, whose authority comes from the "Almighty God."

fused to grant relief because the issues were of an "ecclesiastical nature." As a result of the 1994 dispute, the Church's articles of incorporation and by-laws were amended on October 8, 1994. These amendments created an administrative committee, which consisted of all the apostles residing in the United States. The administrative committee is primarily responsible for ecclesiastical and clerical affairs.[2] In order to conduct business, the administrative committee must have at least a majority of the Quorum present. The amendments to the articles and by-laws also created an executive committee, which consisted of all the bishops residing in the United States. The executive committee is responsible for the temporal and secular affairs of the Church. The amendments also provide for a nine-member board of directors, which consists of six members from the administrative committee and three members from the executive committee.

In February 1995, Apostle George Martin tendered his resignation from the Quorum of Apostles. This resignation left the administrative committee with six apostles living in the United States. The result was a three-three split in the voting, leading to stalemates on many issues. Subsequently, Mr. Martin felt called back by God as an apostle. Only three of the apostles recognized his return. As a result, Apostle Godwin Inyang was contacted in Africa. In his capacity as an apostle—but not as a member of the administrative committee, since he did not reside within the United States—Inyang, as the fourth vote of the seven apostles, accepted Mr. Martin's resignation and, apparently, did not accept his recall.

On September 30, 1995, at a regularly scheduled "Joint Quorums" meeting of the apostles and bishops, Mr. Paul Savage requested ordination to the position of an apostle. The vote was split three to three and, therefore, the request failed. The next

meeting of the Joint Quorum was scheduled for January 13, 1996.

In the meantime, in November 1995, members of the Rolfe-group apparently took action to ordain Mr. Savage and re-ordain Mr. Martin as apostles. On January 8, 1996, the Parker-group and Apostle Godwin Inyang, constituting four of the seven apostles voted, in their capacity as Quorum of Apostles, to remove the Rolfe-group from their priesthood positions in the Church. Rolfe, Wilken, and Leighton–Floyd (who is not a party to this suit) were removed from their positions as apostle. Additionally, Sechrest and Lee were removed from their positions as bishop.

On January 13, 1996, Messrs. Rolfe, Wilkin, Sechrest, Savage, and Martin, arrived at the Church for the previously scheduled meeting of the Joint Quorum. The Church was locked, and the Parker-group was inside. The Rolfe-group obtained the services of a locksmith to let them in. A disagreement between the two groups ensued, and the police were called. After the police determined that the dispute was a civil matter, they refused to intervene. The Rolfe-group then withdrew from the premises.

After the altercation, apparently at meetings that afternoon and on January 17, 1996, the three members of the Parker-group, as well as Godwin Inyang, voted to remove the entire Rolfe-group from the board of directors.[3] On January 22, 1996, the remaining board of directors met and removed James Rolfe as President of the Church. These meetings were evidenced by letters sent, after the fact, to Rolfe and Sechrest regarding their removal from their corporate and priesthood positions of the Church. These actions, and the propriety thereof, is the basis of this appeal.

**Issue:**

2. Article III, Section 6 of the Bylaws states that: "[t]he Administrative Committee shall have primary responsibility for the *ecclesiastical and clerical* affairs of the corporation and the Administrative Committee shall direct the Board of Directors of the action to be taken with respect to such matter. If any matter the nature of which is both ecclesiastical or clerical and temporal or secular, the Administrative Committee shall act

jointly with the Executive Committee in directing the Board of Directors of the action to be taken with respect to such matters." (emphasis added).

3. The parties disagree as to whether they were acting in their capacity as a majority of the Quorum of Apostles, or as the administrative committee.

The Rolfe-group contends that the contest was between two factions within a not-for-profit Missouri corporation disagreeing over which group of individuals was the duly elected and qualified officers of the Church, and this issue was not a "purely ecclesiastical" matter. The Rolfe-group bases its claim on the Church's October 1994 amended articles of incorporation and by-laws, which they assert served to change the structure of the corporation so that the apostles relinquished control of the Church to the administrative committee who has the primary responsibility for the ecclesiastical and clerical affairs. As such, the actions of the Parker-group did not properly operate to remove them as members of the committees and/or board of directors under the amended articles and by-laws.

The Parker-group, however, contends that this dispute is an ecclesiastical matter. They maintain that whether an individual receives a calling to a priesthood position in the Church is subject to ecclesiastical, not corporate, law and, therefore, "callings, ordinations and removals" of priesthood positions are not within the subject matter jurisdiction of the civil courts. They argue that the Church is ultimately governed by a Quorum of Apostles, and that the board of directors and the executive and administrative committees serve only at the will and pleasure, and under the authority, of the Quorum of Apostles.[4]

The trial court determined that the apostles, not the administrative committee, constituted the authority of the Church. Hence, the ultimate issue is who was called to serve as an apostle. The trial court thereby ruled that such determination was of an "ecclesiastical nature" over which the civil courts did not have subject matter jurisdiction.

## Standard of Review:

The standard of review for this court is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). A reviewing court, when looking at a judgment from a court-tried case, will defer to the trial court's findings of fact and affirm, unless there is no substantial evidence to support it or unless the trial court erroneously declared or applied the law. *Id.* at 32. "The decision to dismiss for lack of subject matter jurisdiction is a question of fact left to the sound discretion of the trial judge and will not be reversed absent an abuse of discretion." *Schopp v. Matlock*, 880 S.W.2d 357, 359 (Mo. App.1994) (citations omitted).

## Argument:

The determinative issue decided by the trial court was which body, the Quorum of Apostles or the administrative committee, was the legally constituted authority of the Church and had ultimate authority over the affairs of the Church. Specifically, which body, the administrative committee or the apostles, have the authority to remove the Rolfe-group from their positions in the Church. This factual question is critical because before the October 1994 amendments to the articles and by-laws, the Quorum of Apostles passed a resolution (law) "[t]hat no men be ordained or removed from either Quorum without the approval of the Quorum of Apostles." The Rolfe-group argues that the resolution was passed long before the October 1994 amendments which changed the structure of the Church, and placed controlling authority with the administrative committee.[5] Thus, they maintain that the resolution is not now binding and has no effect. This open question defines our inquiry because it requires us to determine not only who makes the decisions of the Church as to who is an apostle or bishop, but also, interprets whether the group doing the ousting followed Church doctrine.

**4.** In support of this contention, the Parker-group relies upon a unanimous resolution passed by the Quorum of Apostles on February 26, 1994, prior to the amended articles and by-laws, relied upon by the Rolfe-group, which provides "[t]hat no men shall be ordained or removed from either Quorum without the approval of the Quorum of Apostles" (the Parker-group asserts that the apostles' authority is based on the governing document of the Church of Christ, *The Word of the Lord*). In contrast, the Rolfe-group contends that the subsequent corporate structure vested authority over such affairs with the administrative committee.

**5.** The Rolfe-group also argues that the controlling authority is with the board of directors.

Specifically, the Rolfe-group contends that the interpretation and enforcement of the corporate articles and by-laws is not an ecclesiastical dispute. They argue that "[w]hen the incorporators decided to incorporate under the not-for-profit laws of Missouri, they submitted it to the state courts' jurisdiction in all matters of a corporate nature." *Levy*, 923 S.W.2d at 443. Furthermore, they claim that Missouri courts have determined that the trial court is vested with subject matter jurisdiction to inquire into the authority of the church government. *See Murr v. Maxwell*, 232 S.W.2d 219, 236 (Mo.App.1950). Their position is that the dispute is not who should be an apostle, which they concede is "clearly an ecclesiastical question," but rather a determination of whether the Parker-group, with Apostle Inyang's vote, acting as the Quorum of Apostles, was vested with the authority to remove the Rolfe-group from their positions in the Church and the corporation. They maintain that they are raising questions of authority to act, and whether proper corporate procedure was followed in accordance with the provisions of the amended articles and by-laws, in expelling these individuals.

The Rolfe-group relies upon the decision of *Coates v. Parchman*, which was a dispute between the seven elected deacons on the governing board of the Church. 334 S.W.2d 417 (Mo.App.1960). The *Coates* court found that it was not deciding "purely ecclesiastical questions" in determining the officers because "in the handling of temporal affairs, the managing board ... occupies a position analogous to that of managing directors of a business corporation." *Id.* at 423. The Rolfe-group also relies on *The Beth Hamedrosh Hagodol Cemetery Ass'n v. Levy*, where the parties formed a not-for-profit corporation to manage a cemetery association in connection with Orthodox Jewish worship. 923 S.W.2d 439, 440 (Mo.App.1996). The articles of incorporation provided that the board of directors must be members of the Beth Hamedrosh Hagodol Congregation. Two of the members of the board were removed from membership in the congregation and, therefore, the plaintiffs argued that it was unnecessary for them to properly remove them as directors, because they were automatically disqualified since they were no longer congregation members. *Id.* at 443. The *Levy* court ruled that cases of excommunication, absent some question of the authority or procedure used, are ecclesiastical matters. *Id.* at 442–43. However, the court also determined that "it is evident that the true issue raised ... is whether Respondents qualify to continue as directors of the board, a matter wholly within the purview of the courts." *Id.* at 443. They held that, in that case, resolution of "the matter does not require the court to become entangled in religious doctrine or unconstitutionally interfere with a religious bodies' affairs." *Id.* at 444.

In contrast, the Parker-group argues that callings, ordinations, and removals are beyond the corporate committees and boards, and are not subject to the interpretation by the corporate documents. It is their position that the ultimate authority to remove the Rolfe-group from their positions resides with the Quorum of Apostles pursuant to the resolution that states that no man be ordained or removed from either Quorum without the approval of the Quorum of Apostles. Therefore, the trial court correctly applied the law in that the act of ousting the leaders of a religious body has long been an ecclesiastical matter because "the officers of a religious society [are] to be determined according to the discipline of that society, and civil courts will not review the decision of a competent ecclesiastical body upon a question involving the election of officers." *Olear v. Haniak*, 235 Mo.App. 249, 131 S.W.2d 375, 381 (1939) (citations omitted).

The Parker-group claims that it is inconsistent with the American concept of the relationship between church and state to permit civil courts to determine ecclesiastical questions. The Supreme Court first acknowledged the special place of religious organizations in American society in 1871 in the case of *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871). In a case factually similar to this one, the ultimate issue in that case was which of two competing factions within one church had the "power to exercise religious authority" over the church building. *Id.* at 681. The Supreme Court held that "judges of the civil courts

[are not] as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own." *Id.* at 729. As such:

> where a subject-matter of dispute, strictly and purely ecclesiastical in its character,— a matter over which the civil courts exercise no jurisdiction,—a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of its members of the church to the standard of morals required of them, ... no jurisdiction has been conferred on the tribunal to try the particular case before it

*Id.* at 733. *See also Bouldin v. Alexander,* 82 U.S. (15 Wall.) 131, 21 L.Ed. 69 (1872); *State ex rel. Watson v. Farris,* 45 Mo. 183 (1869).

The common law doctrine of church autonomy established by the *Watson* ruling was confirmed under the First Amendment in the case of *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America,* 344 U.S. 94, 116, 73 S.Ct. 143, 154–55, 97 L.Ed. 120 (1952). The parties in the *Kedroff* case were disputing which leaders of the Russian Orthodox hierarchy possessed authority to appoint the priest at a church in New York City. *Id.* at 106, 73 S.Ct. at 149. The New York legislature had passed a statute determining which decision controlled, and the Supreme Court ruled that the statute violated the First Amendment's rule of separation of church and state. *Id.* at 110, 73 S.Ct. at 151.

Church autonomy, under First Amendment analysis, was firmly established in the case of *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). In that case, a bishop challenged his church's action in removing him from office. *Id.* at 697–98, 96 S.Ct. at 2375. The Illinois state court took cognizance of the dispute, and ruled that the removal should be overturned because the church acted arbitrarily. *Id.* at 712–13, 96 S.Ct. at 2381–82. The Supreme Court ruled that arbitrariness was not a proper basis for civil court interference, as such interference in an internal church dispute "must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow ... [and] this is exactly the inquiry that the First Amendment prohibits." *Id.* at 713, 96 S.Ct. at 2382. Such inquiry would serve to "undermine the general rule that religious controversies are not the proper subject of civil court inquiry." *Id.*

In *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* the Supreme Court again followed the dictates of *Watson,* and ruled that in a hierarchal church system, civil courts are left with "no role in determining ecclesiastical questions in the process if resolving property disputes." 393 U.S. 440, 447, 89 S.Ct. 601, 605, 21 L.Ed.2d 658 (1969). A determination that departs from general law principles:

> requires the civil court to determine matters at the very core of religion—the interpretation of particular church doctrines and the importance of those doctrines to religion. Plainly, the First Amendment forbids civil courts from playing such a role.

*Id.* at 450, 89 S.Ct. at 607.

In 1979, the Supreme Court, in the case of *Jones v. Wolf,* was asked to review a church property dispute involving a congregation who had voted to terminate its affiliation with the Presbyterian ecclesiastical government. 443 U.S. 595, 597–98, 99 S.Ct. 3020, 3022–23, 61 L.Ed.2d 775 (1979). The minority sued the majority to get back the church property. *Id.* at 604, 99 S.Ct. at 3026. The Supreme Court affirmed the state court's ruling in favor of the majority, because Georgia was constitutionally entitled to adopt a "neutral principles of law" standard regarding the property issue and, as such, the court could identify a majority without "resolving any question of religious doctrine or polity." *Id.* at 607, 99 S.Ct. at 3027. However, since "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes," the application of neutral principles may be used to resolve church disputes only when the inquiry does not involve an examination of religious doctrine. *Id.* at 602–03, 99 S.Ct. at 3025 (quoting *Presbyterian Church,* 393 U.S. at 445, 89 S.Ct. at 604).

The "neutral principles of law analysis" was applied by the Missouri Court of Appeals, in *Struemph v. McAuliffe*, when the court found that the trial court erred in ruling that the parishioners had control over a church building and its contents, because a purely secular review of the documents did not support such a ruling. 661 S.W.2d 559, 562 (Mo.App.1983). The court noted that there are numerous factual variations presented by litigation involving church organizations and that "[t]he constitutional boundary restraining the authority of the civil courts is difficult of demarcation." *Id.* The *Struemph* court found that the trial court's determination of who was a "moral person" under church doctrine, was a religious precept beyond their review.[6] *Id.* at 567.

The Parker-group asserts that the real issue before the court—the ordination and the removal of apostles and bishops—does not require an interpretation of the articles and by-laws, nor an assessment as to whether or not they were followed. They contend the articles and by-laws only address membership on the committees and the board of directors, once a person has become or has been removed as an apostle or bishop, pursuant to the mandates of Church doctrine (as found in *The Word of the Lord.*) "Callings, ordinations and removals are not subject to secular, or corporate law" and, as such, the trial court did not err in determining that the issue was of an ecclesiastical nature and not subject to civil court jurisdiction.

Our review of the case law leads us to the conclusion that if the Quorum of Apostles was the governing body, the decisions with regard to who should be removed as an apostle or bishop is clearly an ecclesiastical decision, and not within the jurisdiction of the civil court. The trial court found that:

[t]he decision of who will be an Apostle or Bishop ultimately rests on revelations from God. The issues about the conduct of the

[Rolfe-group] which resulted in their ouster are purely ecclesiastical. This is true is spite of the efforts by the [Rolfe-group] to make this an issue of interpretation of corporate by-laws and minutes. The ultimate issue here does not involve the corporation. *The ultimate issue here is who are the Apostles.* There is no way that can be a non-ecclesiastical issue.

(emphasis added.)

We cannot say that the trial court abused its discretion in making the factual determination that the Quorum of Apostles was the governing body of the Church. *Jones v. Wolf,* 443 U.S. at 607, 99 S.Ct. at 3027; *Struemph,* 661 S.W.2d at 566 (applying neutral principles of law). Consequentially, the question of who was authorized to act in the priesthood position of apostle was not within the civil court's subject matter jurisdiction as such determination "concerns doctrine, creed or form of worship of the church." *Olear,* 131 S.W.2d at 380. "[T]he determination of who are qualified members of the church is an ecclesiastical matter." *Fast v. Smyth,* 527 S.W.2d 673, 676 (Mo.App.1975)(citing *Henson v. Payne,* 302 S.W.2d 44, 50 (Mo.App.1956)). *See also Milivojevich,* 426 U.S. at 713, 96 S.Ct. at 2382. These are ecclesiastical matters. Therefore, the civil court does not have subject matter jurisdiction.

■ The Rolfe-group contends that the trial court lacked subject matter jurisdiction to rule on which party should receive the Sterling Bank interpleaded funds. However, the trial court ruled only that they lacked the jurisdiction to determine who was an apostle of the Church. As discussed, the trial court correctly determined who was authorized to govern the Church. As such, (applying neutral principles of law), the trial court properly ruled that the governing body with the proper credentials, should receive the inter-

---

6. In *Stamps v. Kirkendoll,* the case which the trial court in this matter relied upon when ruling that this issue was ecclesiastical, the Missouri Court of Appeal was asked to review a church dispute where the bishop of a church refused to appoint the plaintiff, Reverend Stamps, to an assignment in a parish. 689 S.W.2d 111, 113 (Mo.App.1985). The Stamps court found that

Reverend Stamps' position was employment-at-will, determined that "there was no protectable property interest at issue here," and concluded that trial court involvement was "violative of the constitutional guarantees of the separation of church and state functions." *Id.* at 114 (citing U.S. Const. Amend. I).

pleaded funds. *Jones v. Wolf,* 443 U.S. at 607, 99 S.Ct. at 3027. Affirmed.

LOWENSTEIN, P.J., and BRECKENRIDGE, J., concur.